*In re* MARRIAGE OF STEVEN L. BASHWINER, Petitioner-Appellee, and ARDEN J. BASHWINER, Respondent-Appellant.

First District (5th Division)    No. 81-848

Opinion filed June 18, 1982.—Rehearing denied August 4, 1982.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles N. Beermann and Howard A. London, of counsel), for appellant.

Friedman & Koven, of Chicago (Robert J. Rubin and Rebecca Block, of counsel), for appellee.

JUSTICE MEJDA delivered the opinion of the court:

Steven L. Bashwiner filed a verified petition pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72) to vacate a marital settlement agreement (agreement) entered into with Arden J. Bashwiner and those parts of the judgment dissolving their marriage which incorporated the agreement. After a bench trial the court found that the agreement was procured by fraud and vacated the provisions of the judgment pertaining to maintenance, property, custody, child support and attorney fees. Arden appeals from the court's order granting petitioner's section 72 petition.

Arden raises three issues on appeal: (1) whether the trial court improperly permitted Steven to testify to the contents of certain correspondence addressed to Arden; (2) whether the trial court improperly permitted Steven to testify to a statement made by his daughter; and (3) whether the trial court's ruling is against the manifest weight of the evidence.

On July 24, 1980, the trial court entered a judgment of dissolution of marriage incorporating a marital settlement agreement entered into by Arden and Steven. The agreement provided that Arden would have custody of the couple's two children and that Steven would be entitled to reasonable visitation. The agreement further specified that Steven was to pay unallocated family support to Arden. Although these payments were not to be reduced in the event Arden remarried, they were to be systematically and substantially reduced from 1980 through 1984, the initial four years of payment, as follows: August 1, 1980, through December 1980, $3,325 per month; January 1981, $3,375; February 1981 through July 1981, $2,500 per month; August 1981 to July 31, 1982, $2,084 per month; August 1, 1982, to July 31, 1984, $1,666 per month. Commencing August 1, 1984, Steven was required to pay $1,333 per month until the death, emancipation or marriage of his daughter and $667 per month thereafter until the death, emancipation or marriage of his son, at which time he was no longer required to make any payments to Arden. The agreement further provided that the family support payments were to be deductible to Steven and taxable to Arden whether or not she remarried, and called for a 50% reduction in the total amount of payments required to the extent the payments were treated as nondeductible to Steven by the Internal Revenue Service.

On September 30, 1980, Steven filed a verified section 72 petition to vacate the marital settlement agreement and declare void those portions of the judgment of dissolution of marriage incorporating the settlement agreement on the grounds that both the agreement and the judgment had been procured by Arden's fraud upon him and upon the court. The petition alleged in pertinent part that at all times during the negotiations

leading to the settlement agreement, and at the time of signing the agreement and the entry of judgment, Arden had the present intention to marry James Lewis and remove the couple's children to Washington, D.C.; that she actively concealed her intentions and plans from Steven; and further that had Steven known of Arden's intention to marry Lewis and remove their children to Washington, D.C., he would not have signed the agreement or consented to the judgment of dissolution, but would have contested various provisions and vigorously sought custody of the children. Arden filed a verified answer denying the substantive allegations of the petition. She affirmatively alleged that she did not decide to marry Lewis until some time after the execution of the settlement agreement.

The following evidence was adduced at the hearing convened pursuant to Steven's section 72 petition. Arden first met Lewis in 1964. He proposed marriage to her in 1966 but she rejected that proposal. She married Steven that same year. Two children were born of the marriage, Heather in 1972, and David in 1975. In September 1979 Arden began law school. On February 7, 1979, Steven filed a petition for dissolution of marriage which sought custody of the two children. Arden filed a response thereto and a counterpetition for dissolution of marriage. Subsequently, both parties engaged in settlement negotiations through their respective attorneys. In February 1980, a year after she filed her counterpetition for dissolution of marriage, Arden wrote to Lewis who resided in Washington, D.C. She explained that she planned to visit her brother who lived in Washington, D.C. While there she wished to discuss legal opportunities with Lewis. Lewis later telephoned her and during her March 1980 trip to Washington, D.C., Arden visited with Lewis. She told Lewis that she was interested in moving to Washington, D.C. Subsequent to her trip to Washington, D.C., Lewis flew to Chicago to visit her for a weekend in April, one weekend in May, and the first full weekend in June, staying at her home on each occasion. During this time period Lewis and Arden spoke with each other by telephone at least once every week. At this time Steven found out from the children that Arden was dating a Washington, D.C., attorney named Jim Smith and that he was her boyfriend. Steven did not learn that Jim Smith was actually Jim Lewis until later.

Following the June 13, 1980, prove-up on the grounds for dissolution of their marriage, Arden handed Steven a list of provisions she felt should be incorporated into any settlement agreement, including a request that Steven pay for private schooling for the children, provisions for alternate visitation should Arden and the children move from Illinois, and a statement that Arden would not agree to seek court approval before removing the children from Illinois. Arden testified that in telephone conversations regarding these proposals, she told Steven she was not planning to re-

marry but that he could not create a "disincentive" for remarriage in the settlement agreement. She further testified that Steven told her that he knew that she was dating a Washington, D.C., attorney and might want to move there and marry him. Steven rejected Arden's proposals. Steven, however, denied having any discussion with Arden regarding her boyfriend until September 8, 1980.

Lewis again flew to Chicago to visit Arden during the weekends of June 20-22, the Fourth of July, and July 11-13. Arden did not sleep with Lewis until June 1980.

On July 14, 1980, Steven and Arden appeared before the trial court for an evidentiary hearing on the issues of custody, maintenance, support and division of the marital and nonmarital property. During the final negotiations Arden again sought to include in the agreement an alternate visitation provision should the children be removed from Illinois. Steven flatly rejected the proposal, refusing to put anything in the agreement suggesting that the children could be moved away. Additionally, Steven's attorney testified that on that date Arden's attorney objected to a provision in the latest draft of the agreement calling for a reduction of support if Arden remarried, indicating that he wanted to insure enough money for Arden to complete her legal education. Arden's attorney testified that both Steven and his attorney were present when one or the other indicated that they were sure Arden was going to remarry. After lengthy negotiations, agreement between the parties was reached. Arden signed the agreement on July 17, 1980.

On July 18, 1980, Arden flew to Washington, D.C. and stayed with Lewis for 10 days. On July 24, 1980, the trial court entered judgment dissolving the marriage which incorporated the agreement reached on July 14.

On August 22, 1980, Lewis asked Arden to marry him. On September 1, 1980, Steven first heard from his daughter Heather that Arden intended to marry and move with the children to Washington, D.C. Heather also informed her father at that time that the name of the man whom her mother intended to marry was Jim Lewis and not Jim Smith. Arden confirmed that news to Steven on September 8, 1980. Steven filed his section 72 petition three weeks later.

On October 3, 1980, Steven went to his former marital residence to pick up his children. He was admitted by a maid. Steven testified that while in Arden's bedroom looking for a barrette for Heather's hair, he opened Arden's nightstand drawer and removed a letter and a Snoopygram. Steven was allowed to testify to the contents of the correspondence over Arden's objection. The letter was signed "All my love, Jimmy" and its return address was "Captain James Smith," Washington, D.C. The Snoopygram stated, "I have been through a custody fight with Connie in

the 70's and I know how tough it can be, but we'll do it together" and "We blew it in the 60's. We can't blow it in the 80's."

In contrast, Arden testified that although she received a letter and a "Snoopygram" from Lewis, they were not in her home on October 3, 1980, as she had disposed of them in August during housecleaning. Arden further testified that the letter was simply signed "Jim" and the Snoopygram "Cap'n." Following the evidentiary hearing the trial court entered an order finding that the settlement agreement was procured by fraud in the inducement and vacating those portions of the judgment incorporating the terms of the agreement. Arden appeals.

OPINION

As Arden has raised the issue of whether the trial court's order was against the manifest weight of the evidence, we first consider the propriety of certain evidentiary rulings made by the court and challenged by Arden on appeal. Arden asserts that the trial court erred in allowing Steven to testify as to the contents of a letter and a "Snoopygram" which he read after removing them from a nightstand in Arden's bedroom. Arden first contends that this testimony should have been excluded because it was obtained in violation of her Federal constitutional right to privacy.

■■ Arden grounds her privacy claim on the ninth and fourteenth amendments contending that the court's use of the evidence during trial constitutes the State action necessary for a fourteenth amendment claim. She cites no case law directly supporting her theory. We find no merit in this contention. Arguably there are two constitutional privacy interests with which such testimony might interfere: the individual interest in avoiding disclosure of personal matters (*Whalen v. Roe* (1977), 429 U.S. 589, 51 L. Ed. 2d 64, 97 S. Ct. 869; *Nixon v. Administrator of General Services* (1977), 433 U.S. 425, 53 L. Ed. 2d 867, 97 S. Ct. 2777) and the individual's right to be secure in her person, house, papers and effects from unreasonable searches and seizures. (*Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1634.) Here, however, neither interest has been transgressed. These letters reveal nothing of a sensitive nature about Arden nor do they constitute privileged communications. (*Whalen v. Roe.*) While Arden has a legitimate expectation of privacy in her personal communications, that expectation cannot be considered in the abstract (*Nixon*) and cannot prevail here in light of the court's need for access to all available competent and relevant evidence to facilitate the truth-seeking process. Nor has Arden's right to be secure in her papers been violated as that constitutional protection applies only against governmental action. (*Burdeau v. McDowell* (1921), 256 U.S. 465, 65 L. Ed. 1048, 41 S. Ct. 574.) Therefore we conclude that Arden's Federal constitutional

right to privacy has not been violated by the use of the evidence at trial. (See *Honeycutt v. Aetna Insurance Co.* (7th Cir. 1975), 510 F.2d 340.) Similarly we find no merit to her argument that her common law right to privacy or article I, section 12 of the Illinois Constitution requires the exclusion of this evidence.

■■ Arden further claims that Steven's testimony regarding her correspondence with Jim Lewis was irrelevant and should have been excluded on that basis. Evidence is considered relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.) Arden argues that this evidence was irrelevant because it was only probative of Jim Lewis' state of mind and not hers. However, this evidence was probative of the nature of Arden's relationship with Lewis, a factor bearing directly on whether Arden planned to marry Lewis prior to the execution of the settlement agreement, one of the central issues in this case. As such, the evidence was relevant.

■■ Arden next contends that the court erred in allowing Steven to testify to the substance of a telephone conversation with his daughter Heather on September 1, 1980, during which Heather told him that "* * * Mommy is marrying Jimmy and we are moving to Washington, D.C. and his name is Jim Lewis, not Jim Smith." Arden argues that this testimony was irrelevant. We disagree. This testimony was probative of when Steven first learned of Arden's plans to marry and move to Washington, D.C., and hence was relevant. For this same reason it was not hearsay, as it was not offered for the truth of the matter asserted therein, *i.e.*, that Arden was in fact marrying Jim Lewis and moving. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) Therefore, we find no error in these evidentiary rulings.

Finally, Arden contends that the court's finding of fraud in the inducement of the settlement agreement was against the manifest weight of the evidence because Steven did not prove each of the essential elements of fraud by clear and convincing evidence.

■■ A judgment of dissolution of marriage may be vacated or modified if procured through fraud. (*Roth v. Roth* (1970), 45 Ill. 2d 19, 256 N.E.2d 838.) Fraud has been defined as an intentional misstatement or concealment of a material fact made for the purpose of inducing the other party to act. (*Roth; Lagen v. Lagen* (1973), 14 Ill. App. 3d 74, 302 N.E.2d 201; *Garmisa v. Garmisa* (1972), 4 Ill. App. 3d 411, 280 N.E.2d 444.) One test of materiality in cases of alleged fraud requires that the party would have acted differently if he had known the true or undisclosed fact. (*Semmens v. Semmens* (1979), 77 Ill. App. 3d 936, 396 N.E.2d 1282.) The intention to remarry or to move out of State by one of two divorcing spouses has been held to be a material fact when knowledge of it would have influenced

the disposition of property, support or custody. (*Roth; Harris v. Harris* (1977), 45 Ill. App. 3d 820, 360 N.E.2d 113; *Zieske v. Zieske* (1976), 41 Ill. App. 3d 746, 354 N.E.2d 513; *Deahl v. Deahl* (1973), 13 Ill. App. 3d 150, 300 N.E.2d 497.) The misstatement or concealment of the intention to remarry or move would not be in itself sufficient, however, to constitute fraud. (See *Roth; Harris; Zieske; Deahl.*) To prove fraud the complaining party must not only show that the other party falsely stated a material fact or concealed a material fact that he had a duty to disclose but also that the fact was intentionally misstated or concealed to induce the complaining party to act and that the complaining party detrimentally relied upon the misstatement or the nonexistence of the fact. (*Roth; Lagen.*) The burden of proving fraud is on the complaining party who must prove it by clear and convincing evidence. *In re Marriage of McBride* (1981), 102 Ill. App. 3d 84, 429 N.E.2d 867; *Lagen.*

There are three misrepresented or concealed facts upon which Steven predicated his claim of fraud: Arden's misrepresentation of her intention to remarry; her concealment of her intention to move; and her concealment of the identity of her fiance. The trial court found that Arden had concealed her intention to remarry and that Steven detrimentally relied upon that concealment. However, we find that Steven could not have detrimentally relied upon the concealment of this fact, for as the trial court acknowledged in its concluding remarks, the settlement agreement itself contemplated the possibility of Arden's remarriage, and Steven testified that prior to signing the agreement he read it and understood its terms. The trial court also found that Arden concealed her intention to move to Washington, D.C., and that Steven relied upon this concealment. We conclude, however, that the record does not support this finding of reliance because before the execution of the settlement agreement Steven knew that Arden was contemplating moving out of the State at some time. In fact, he testified that she had asked in writing to include a provision for alternate visitation in the agreement should she and the children move out of Illinois. The request stated it was "for [his] safety to spell it out now." He testified that she told him that she wanted to go wherever her career would take her and that should she move she would want to modify visitation. He further testified that, in response to her discussion of moving to Washington or New York, he asked that a provision be included that she would not attempt to remove the children without his consent or leave of court. She refused. Thus, the record shows that while Arden may not have strictly apprised Steven of her plans to move, she certainly apprised him that she was considering the possibility. We do not think Steven can now complain in light of Arden's expressed interest in moving that had he known she was planning to move he would not have signed the agreement.

The final factor that Steven claimed Arden concealed was the identity of her fiance. While in certain cases the identity of the custodial parent's fiance might be material to the issue of custody, Steven has failed to show the materiality of this factor here.

■■ Thus, we conclude that the trial court's finding of fraud is against the manifest weight of the evidence, and we accordingly reverse the trial court's order vacating certain provisions of the judgment of dissolution of marriage.

Reversed.

SULLIVAN, P. J., and WILSON, J., concur.