ROBERT PTASZEK, Plaintiff-Appellant, v. KAREN MICHALIK, Defendant-Appellee.

First District (4th Division) No. 1—91—1151

Opinion filed September 30, 1992.—Rehearing denied December 3, 1992.

JIGANTI, P.J., dissenting.

Anthony Sammarco, of Forest Park, for appellant.

No brief filed for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Robert G. Ptaszek, seeks post-judgment relief from an agreed order of paternity that was entered on December 16, 1986. That paternity declaration was the result of Ptaszek's action to have himself declared the natural father of Erik Robert Michalik. Because the petition to vacate the 1986 order was filed more than two years after its entry, Ptaszek must establish that the ground he asserts for relief from the 1986 order was fraudulently concealed from him. Ill. Rev. Stat. 1989, ch. 110, par. 2—1401(c).

The trial court denied the petition to vacate the order of paternity, finding that Ptaszek failed to establish that Karen Michalik, Erik's mother, had fraudulently concealed the fact that he may not be the child's biological father. In addition, the court found that Ptaszek, who had actively sought and maintained a father-son relationship with Erik for seven years, had failed to exercise due diligence with respect to challenging paternity.

On appeal, Ptaszek urges this court to reverse, claiming that the court's ruling was against the manifest weight of the evidence. He also claims that the trial court erred in refusing to admit into evidence the results of blood tests that were obtained following the filing of his petition to vacate.

For the reasons that follow, we affirm.

BACKGROUND

Ptaszek and Michalik began a sexual relationship in May or June of 1981. When she became pregnant in August of that year, she told him she was certain that he was the father. They discussed the possibility of marriage but at that time the relationship had already deteriorated and it terminated altogether in 1982. The baby was born on April 1, 1982. Two or three months thereafter, Micha-

lik introduced Ptaszek to the man she later married. From the beginning, however, Ptaszek acted as Erik's father and contributed support.

Ptaszek continued to enjoy regular visitation with Erik until 1984, when Michalik tried to put a stop to it. In March 1984 Ptaszek filed a paternity action to establish that he was Erik's natural father and to establish a visitation and support schedule. The complaint asserted that he was Erik's natural father, had developed a close relationship with the child, and that Erik believed him to be his natural father.

Michalik's answer to the complaint admitted Ptaszek's allegation of paternity. She contested his continued visitation, however. In a pleading she filed on December 12, 1986, seeking a mental examination of Ptaszek, she alleged that he had an unstable temper, drank to excess, and abused their son. Her petition also stated that Erik, who would have been more than four years old at that time, "refuse[d] to see [Ptaszek]."

On December 16, 1986, the parties entered into an agreed order that identified Ptaszek as the natural father. The order set out his obligation to pay child support and to provide health insurance while Michalik retained custody of the child. The visitation issue was reserved pending evaluation and counseling of the parties by the social services department.

The record indicates that the parties participated in additional or supplemental court proceedings on the visitation issues and that Ptaszek believed Michalik was impeding his visitation with Erik.

On August 3, 1989, Ptaszek filed the pending petition, pursuant to section 2—1401 of the Illinois Code of Civil Procedure, seeking vacation of the agreed order of paternity that had been entered almost three years earlier. (This was seven years after Erik's birth and 31 months after Ptaszek had obtained the judicial declaration of fatherhood.) In the petition he denies paternity, relying solely on a May 30, 1989, conversation with Michalik in which she stated he was not Erik's father. In support of his section 2—1401 petition, Ptaszek submitted an affidavit stating that he had "had no reason to doubt" Michalik's earlier statements "that acts of intercourse engaged in by [him and Michalik] resulted in her conceiving a child." (In now asserting his nonpaternity as "fact" in the petition to vacate, Ptaszek presumably took Michalik's statement once again at face value.)

According to Ptaszek's testimony at the 1991 hearing on the section 2—1401 petition, he was first told that Erik was not his son

on May 30 when Michalik telephoned and asked Ptaszek why he mistreated her and hit her. His testimony on this point is vague, but apparently the May 30 conversation related to an incident or argument of a day or two before in which Ptaszek had hit Michalik. She called to ask why he "beat her up" and treated her the way he did. According to Ptaszek, this was the first time she told him Erik was not his son.

In her response to the petition to vacate, Michalik stated that at the time of Erik's conception Ptaszek had "no reason to believe that he was the exclusive sexual partner of Karen Michalik" and that he had notice or knowledge of the circumstances surrounding Erik's paternity at the time of birth and at the time of his action to establish paternity. She did not testify at the hearing.

At the hearing, Ptaszek attempted to introduce into evidence blood tests the parties and child had taken pursuant to his request to clarify paternity. Ptaszek had sent the results of the tests to Michalik with a request to admit facts and genuineness of documents. She did not file a response thereto. The trial court ruled that the results of blood tests would not be admitted into evidence, however, on grounds of relevance. The court noted that Ptaszek filed his section 2—1401 petition alleging fraudulent concealment before any such tests were taken and that the petition was not based on the results of the tests.

Ptaszek admitted that he was seeking a reduction of his child support payments in a separate action.

The court then asked Ptaszek a series of questions relating to the circumstances of the parties' 1981 sexual liaison. Ptaszek said that he had believed Michalik when she told him she had not engaged in sexual relations with anyone else during their affair. Ptaszek conceded, however, in response to the court's final question, that "when a lady is engaging in sex with two different men during the period of conception, she really doesn't know who is the father, either."

The court ruled that the facts presented did not justify a finding of fraudulent concealment, noting that Ptaszek had been represented by counsel in the paternity proceedings he had instituted in 1984, two years after Erik's birth. The court also remarked that Ptaszek was aware that Michalik had married within six months after Erik's birth. Ptaszek's paternity action did not conclude until 1986, and he waited more than two years after that before he attacked the judgment and sought blood tests, based solely on a telephone conversation in which Michalik stated that he was not Erik's

father. Accordingly, the trial court denied Ptaszek's section 2—1401 petition to set aside the 1986 agreed declaration of paternity.

OPINION

Ptaszek's brief ignores his own conduct and the passage of time in urging this court to set aside a final judgment of paternity that he actively pursued. In so doing he ignores the principles of *res judicata* and estoppel that Illinois courts have applied in similar situations to prevent persons from changing their minds about parenthood. (See *In re Marriage of Emerson* (1983), 115 Ill. App. 3d 712, 450 N.E.2d 987 (and cases cited therein) (divorced father would be stopped from denying his paternity after he had married a pregnant woman with knowledge of the circumstances and had agreed to the judgment of dissolution that set out his parental rights and obligations).) Michalik did not file an appellee brief, but this does not affect our disposition of the case. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.

A section 2—1401 petition is, of course, a collateral attack on a final judgment rather than a direct appeal from the merits. To reopen a final judgment after 30 days but within two years, a litigant must establish that he has a meritorious claim or defense to the original action; he exercised due diligence in presenting the claim or defense in that action; and he has exercised due diligence in bringing the section 2—1401 petition. (*E.g., Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 499 N.E.2d 1381.) Although the statute is applied with the aim of achieving a just result, the section 2—1401 petition "was never intended to give a litigant a new opportunity to do that which should have been done in an earlier proceeding. The provision was never intended to relieve a litigant of the consequences of his mistake or negligence." *In re Marriage of Travlos* (1991), 218 Ill. App. 3d 1030, 1035, 578 N.E.2d 1267, 1271.

■ After the passage of two years, moreover, even a showing of due diligence and a meritorious claim or defense is insufficient to win vacation of the judgment. Instead, a litigant must additionally establish that the grounds for relief were *fraudulently* concealed from him, in order to toll the limitation period. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401(c); *In re Marriage of Emerson* (1983), 115 Ill. App. 3d 712, 450 N.E.2d 987.) In *Emerson,* the court noted that a party cannot simply assert that the judgment was premised on false facts and that a good defense exists; he must show that the facts could not have been discovered at or prior to the judgment and that he exercised due diligence.

In this case, Ptaszek had the opportunity to either challenge or verify his paternity from the outset. He deliberately chose to claim he was

Erik's father. Certainly, he could have sought blood tests in his original paternity proceeding, had he desired. What he wanted in 1984, however, was to continue his admittedly close relationship with his two-year-old son. Now, years later (after continued struggles over visitation), he reverses himself and seeks to be relieved of the burdens of fatherhood.

In the dry analysis of the elements of a section 2—1401 petition, no one asks what 10-year-old Erik thinks about the apparently disposable nature of fatherhood. That the child might even blame himself for his father's decision to disown him is not, of course, the issue here, but it certainly should give pause to the adults in his life.

This is not a case in which a putative father challenges paternity in a timely fashion and is freed from legal obligation after a finding that he is not the biological father. Indeed, Ptaszek's paternity was never in issue, certainly not from his viewpoint, for eight years. Although it appears that Michalik and Ptaszek only dated for a few months and never seriously considered marriage, Ptaszek embraced his role as father from the beginning. He helped pay the baby's medical expenses, signed the certificate of live birth, contributed to Erik's support, and visited with him. He initiated the 1984 action for declaration of paternity to safeguard that relationship, not because Michalik denied that he was the father. In fact, she admitted the allegations of his paternity complaint.

The allegations of fraud in this case are exceedingly slim. Ptaszek states, in essence, that he believed Michalik's statement that he was Erik's father back in 1981 but now he believes her 1989 statement that he is not really Erik's father after all. How she could have been *certain* of either set of representations is left unexplained, which undercuts the fraud theory substantially.

In our opinion, the blood tests in the pending case were properly excluded as immaterial to the issue of fraudulent concealment. Neither Michalik nor Ptaszek previously had the benefit of such tests and both parties apparently had long believed or at least agreed to accept that Ptaszek was Erik's father. Even if the blood tests are assumed to be accurate and reliable on the issue of biological paternity, Ptaszek's burden of proof on his petition to vacate the three-year old paternity judgment was not to simply show he is not the father after all. Rather, his burden was to establish by clear and convincing evidence that Michalik knew he was not the father and intentionally misled him about that fact, upon which he relied to his detriment. *E.g., In re Marriage of Bashwiner* (1982), 107 Ill. App. 3d 772, 779, 438 N.E.2d 490 (and cases cited therein); accord *In re Marriage of Travlos* (1991), 218 Ill. App. 3d 1030, 1037, 578 N.E.2d 1267.

■ We find that Ptaszek failed to adduce sufficient evidence that Michalik actually knew or should have known he was not the biological father and deliberately lied about it. Even if Michalik failed to disclose that she had engaged in sexual relations with other men during the time of Erik's conception, Ptaszek could have sought clarification of his paternal status at the time the child was born. (See *In re Marriage of Halas* (1988), 173 Ill. App. 3d 218, 527 N.E.2d 474 (silence alone is not fraudulent concealment and the issue of fraudulent concealment is necessarily analyzed in the context of the due diligence requirement).) The parties' short-lived affair was casual and Michalik married another man within months of the baby's birth. Instead of questioning his paternal standing, Ptaszek did everything possible to assure that Erik would be regarded by all as his natural son. Michalik did nothing to prevent him from seeking blood tests or other assurances of his paternity, either before, during, or after his 1984 paternity suit. Ptasek's willingness to rely on Michalik's statements that he was the father does not mean she affirmatively stopped him from ascertaining the true facts of his paternity. Accordingly, we find that he failed to establish that he had a right to rely on her alleged misrepresentations, particularly in light of the facts of which he had actual notice. See *In re Marriage of Travelos*, 218 Ill. App. 3d at 1038 (divorced husband's theory regarding ex-wife's fraudulent concealment of bank accounts failed where husband did not avail himself of the means of knowledge open to him).

The sole testimony in support of the alleged fraud was that Michalik first told Ptaszek that the child was his and then years later, during an argument, said the opposite. Both statements, necessarily, are at the most *opinions*; as long as Michalik had more than one sexual partner during the period of conception, there was no way for anyone to be absolutely certain of paternity, particularly without blood tests or other evidence that neither party sought in the original paternity action. Therefore, we find that Ptaszek failed to establish a knowingly false statement of material fact on which he had the right to rely. (See *Metropolitan Bank & Trust Co. v. Oliver* (1972), 4 Ill. App. 3d 975, 978, 283 N.E.2d 62 (statements of opinion or which deal with expectations or probabilities are not generally actionable as misrepresentations of fact).) We further find that Ptaszek failed to establish detrimental reliance because the very point of Ptaszek's 1984 paternity action was to *establish*, not refute, his paternity. After achieving that result, Ptaszek cannot now claim he was prevented from finding the truth simply because he took Michalik's statements at face value and adopted them to suit his own purposes.

The bare, unauthenticated results of the blood tests do not persuade us that Ptaszek should be permitted to reopen the paternity issue three

years after that ultimate issue of fact was, or should have been, settled. Given the parties' actions and intentions from 1982 through 1989, the blood tests are virtually beside the point. Even if we were to consider the results of the blood tests at this juncture, we believe that while they may tend to show mutual mistake of fact regarding biological paternity, they are not indicative of actual fraud.

We conclude that the 1986 order was a final adjudication of important issues involving the child's welfare as well as Ptaszek's rights and obligations as his father. It is of little significance now to say that Ptaszek might never have sought a declaration of his own paternity if he had earlier known or had good reason to suspect that he was not Erik's biological father. That may be true. Or, it may be that he really did not care; his own complaint for paternity cited his belief he was the "natural" father of Erik, who had a close relationship with the child. Ptaszek insisted on a judicial declaration of the very fact he now says he was precluded from ascertaining or disproving because of Michalik's fraud. We cannot approve such a solecism. From the time of Erik's birth, Ptaszek's aims were to acknowledge paternity, pay support, and sustain the father-child relationship through visitation. He had access to all the relevant facts except whether Michalik had other sexual partners. He chose not to question his fatherhood at a time when, if biological paternity was the true concern, he might have spared an innocent child much pain. We find it illogical and disturbing that Ptaszek now insists that he was defrauded, misled, or otherwise prevented from learning the "true" facts of Erik's biological paternity.

We conclude that the trial court's denial of Ptaszek's petition to vacate the order of December 16, 1986, was correct.

Affirmed.

JOHNSON, J., concurs.

PRESIDING JUSTICE JIGANTI, dissenting:

The majority advances three reasons to support its determination that the trial court properly denied the plaintiff's request for post-judgment relief. First, the majority states that there was no evidence of fraudulent concealment on the part of the defendant because, even though she represented under oath that the plaintiff was Erik's natural father, she could not have been certain of that fact. Therefore, the plaintiff did not establish a knowingly false statement of material fact on which he had the right to rely. (*Metropolitan Bank & Trust Co. v. Oliver* (1972), 4 Ill. App. 3d 975, 978, 283 N.E.2d 62.) Second, the majority

concludes that the plaintiff failed to exercise due diligence in the original paternity action because he did not insist on a blood test to establish paternity. Third, the majority concludes that two separate blood tests which excluded the plaintiff as Erik's natural father were "beside the point" and therefore properly excluded by the trial court. I respectfully dissent from the majority opinion because I disagree with all three of these conclusions.

First, I believe that the defendant's categorical representations of very private matters concerning Erik's parentage are sufficient to constitute fraudulent concealment. Fraudulent concealment has been defined as consisting of affirmative acts designed to prevent the discovery of a cause of action or ground for relief. (*In re Marriage of Halas* (1988), 173 Ill. App. 3d 218, 224, 527 N.E.2d 474.) The majority states that the defendant's representations that she was sure the plaintiff was Erik's father were "at the most *opinions*" and that "[h]ow she could have been *certain*" of those representations is left unexplained. (Emphasis in original.) (238 Ill. App. 3d at. 77-78.) The explanation is really quite simple. The defendant could have been "certain" only if she was engaging in sexual intercourse with no one other than the plaintiff. This is the only logical interpretation of the defendant's repeated representations that she was sure the plaintiff was Erik's father. At the hearing on his section 2—1401 petition, the plaintiff testified that "I asked her if she was sure if it was my child. And she said she is sure it was my child ***." When asked whether he ever determined whether the defendant was having sexual relations with anyone else, the plaintiff responded, "I didn't have her investigated. I did question her to see if she was having anybody else." According to the plaintiff, the defendant never gave him any indication that it was possible that he was not Erik's father, and he trusted her.

Supporting the plaintiff's position that the defendant made misrepresentations as to Erik's parentage at the time of the judgment in the paternity action is her continued insistence that the plaintiff is in fact the only one who could be Erik's father. After the blood tests in the proceeding excluded the plaintiff as the father, the defendant filed a petition asking for a second blood test. Her reason was that the first blood test "must have [been] a mistake." She further alleged that "at the time the child was conceived, the Defendant *** was a virgin and had her first sexual intercourse with [the plaintiff]." She then stated that "during all of the time in question, she had no contact with any other man."

Furthermore, in her answer to the plaintiff's 1984 complaint to establish paternity, the defendant admitted under oath that the plaintiff was Erik's natural father. If, as the majority appears to accept, the defendant was engaging in a sexual relationship with more than one man at the time Erik was conceived, this admission was certainly a misrepresentation because she would have had no way of knowing whether the plaintiff was the father.

In *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427, this court found fraudulent concealment based on the defendant's misrepresentations as to his future income made in a letter sent by the defendant's lawyer to the plaintiff's lawyer. The court found that the record strongly suggested that the defendant was well aware of his earning power and that the plaintiff relied upon the misrepresentations to her detriment. The court stated that although settlements are looked upon with favor, a settlement agreement may be set aside where inequity and unfairness have been accomplished by some element of coercion or misrepresentation. (*Bellow*, 40 Ill. App. 3d at 445-46, 352 N.E.2d at 431.) In my opinion, the facts in the case at bar are sufficient to establish fraudulent concealment.

The second conclusion reached by the majority is that the plaintiff did not exercise due diligence in determining paternity during the original paternity action. Due diligence requires that the party bringing the section 2—1401 petition have a reasonable excuse for failing to act within the appropriate time. (*In re Marriage of Halas* (1988), 173 Ill. App. 3d 218, 224, 527 N.E.2d 474.) In determining reasonableness, all of the circumstances must be examined, including the conduct of the litigants at the time the original judgment was entered. (*Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 222, 499 N.E.2d 1381.) In certain limited circumstances, the due diligence requirement may be waived if the result is unfair, unjust or unconscionable. *Airoom*, 114 Ill. 2d at 225, 499 N.E.2d at 1388.

In the case at bar, the defendant told the plaintiff before Erik was born that she was sure the child was the plaintiff's. The plaintiff signed Erik's birth certificate, and the defendant allowed him to visit with Erik even after she married another man. It was only when the defendant threatened to cut off visitation that the plaintiff filed an action to establish paternity. In her answer to the complaint, the defendant admitted that the plaintiff was Erik's natural father. An agreed order was then entered establishing the plaintiff's paternity. The majority states that before he entered into the agreed order, the plaintiff should have insisted upon blood tests to establish that he was the father. In my view, this imposes an unwarranted burden upon the

plaintiff given the facts of this case. At the time the suit was filed, the possibility that the plaintiff was not Erik's father had never been raised. I do not believe that the plaintiff's failure to insist upon a blood test established that he failed to exercise due diligence in the original paternity suit. The plaintiff had a right to rely on the categorical assertion that he was the father where there was evidence that the defendant represented to the plaintiff that he was the only man with whom she had had sexual relations. This is buttressed by the fact that at the time of the instant proceeding she still insists that the blood test is in error and that during the time in question she had no contact with any other man.

The third conclusion stated by the majority is that evidence of two blood tests which show that the plaintiff is not the natural father of Erik are "beside the point" and were properly excluded by the trial court. (238 Ill. App. 3d at 79.) I disagree. One of the elements the plaintiff must establish in requesting section 2–1401 relief is that he has a meritorious defense. (*In re Marriage of Halas* (1988), 173 Ill. App. 3d 218, 223, 527 N.E.2d 474.) I believe that the test results, which the plaintiff asserts excluded him as the father, were admissible on that issue.

With little grace and for no legal reason, the plaintiff has endured a personal attack which characterizes him as a person who is trying to disown his child because he wants to be relieved of the burdens of fatherhood. With no apparent support in the record, the majority refers to the "disposable" nature of fatherhood and suggests that biological paternity was not the plaintiff's true concern. The majority repeatedly accuses the plaintiff of believing the defendant. I find these attacks particularly unfair in light of the fact that the plaintiff, when told the child was his, accepted his responsibilities by establishing a relationship with the child and making support payments.