ERIK KOELLE, Plaintiff-Appellant, v. JAN ZWIREN, Defendant-Appellee.

First District (1st Division)   Nos. 1—94—1383, 1—95—0666 cons.

Opinion filed October 28, 1996.

780

Laterza & Heilizer, of Chicago (Glenn E. Heilizer and B. Franco Laterza, of counsel), for appellant.

Altheimer & Gray, of Chicago (Paul P. Biebel, Jr. and Richard M. Carbonara, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, Erik Koelle, brought this action against defendant, Jan Zwiren, for fraud, intentional infliction of emotional distress, and equitable relief. The trial court dismissed all counts with prejudice. Plaintiff appealed, contending that (1) the trial court erred in ruling that plaintiff was not entitled to equitable relief, (2) the trial court erred in ruling that plaintiff's fraud and intentional infliction of emotional distress claims are barred by the applicable statutes of limitations, and (3) the trial court erred in ruling that plaintiff failed to state a claim upon which relief can be granted.

Plaintiff's complaint alleges the following facts. In the early 1970s plaintiff's parents were divorced, and plaintiff lived with his mother. Defendant and plaintiff's father were romantically involved and living together. Plaintiff was 12 or 13 years old at the time and had a strong relationship with his father. He saw defendant, who was 20 years his senior, whenever he visited his father. Defendant soon came to be a maternal figure for plaintiff; she took him on family outings, exchanged cards and gifts with him on Christmas and birthdays, and often spent time alone with him. Also, plaintiff sometimes spent the night at his father's and defendant's apartment.

Plaintiff's complaint alleges that over time, defendant came to treat plaintiff like her own son, and plaintiff came to love and respect defendant as a second mother. Defendant has a forceful personality in both her personal and professional life, and she had a strong influence on plaintiff. Plaintiff and defendant frequently spoke about matters important to plaintiff, and defendant offered her advice and guidance on such issues throughout plaintiff's adolescence.

In the late 1970s defendant and plaintiff's father separated. However, plaintiff and defendant maintained their close relationship, and she continued to treat him like a son, taking him out, visiting him, and buying him clothes.

In 1983, plaintiff was 21 years old and working at a graphic arts studio and hoping to start a career in advertising. Defendant was a successful advertising executive, and plaintiff began seeking counsel from defendant not only on personal matters, but on professional matters as well. In the fall of 1983, defendant asked plaintiff to help her move her boat to a new docking point. While on the boat, defendant produced a bottle of tequila and shared it with plaintiff. She then initiated sexual activity with plaintiff, telling him that she was not able to become pregnant. Plaintiff and defendant had sexual intercourse twice that weekend.

In July 1984, defendant gave birth to a baby girl, referred to herein as Jane Roe. The girl's father was Arthur Bass, a wealthy, married man and a client of defendant's advertising agency. Defendant told Bass that he was Jane Roe's father, and eventually Bass agreed to provide financial support for the child. Bass has since died.

Plaintiff's complaint alleges that in an effort to prevent any damage to her professional reputation and career that might have resulted if her illicit affair with her agency's client had been exposed, she contrived a scheme to keep the affair a secret by telling plaintiff that he was the child's father even though she knew he was not. The complaint alleges that defendant selected plaintiff as the target of her scheme because she knew that she exercised a tremendous amount of control over him, that he had trust and confidence in her, and that he was young and inexperienced in relationships. She knew that plaintiff would believe her and that he would comply with her request not to reveal his paternity to his family and friends.

Plaintiff alleges that defendant implemented her scheme, and it worked as planned. Defendant invited plaintiff to her home and introduced him to Jane Roe. While plaintiff was holding the baby, she said "say hello to your daughter." Defendant told plaintiff that her doctor had pinned down the date of conception to their weekend on the boat. She said that Jane Roe was their "tequila baby." She also made it clear that she was not seeking any financial support from plaintiff; she only wanted him to help take care of the child and become a father figure for her. Because plaintiff trusted defendant then as he always had before, he never suspected that she might be lying.

Throughout the next eight years, plaintiff became very involved in Jane Roe's life. He babysat for her and took her on various out-

ings, such as dinner, the movies, baseball games, roller blading, and bicycling. He went to her horseriding shows, piano recitals, soccer games, and parent-teacher conferences. He also went with defendant and Jane Roe on a "family vacation" to Florida. Plaintiff and Jane Roe had a loving father-daughter relationship.

Plaintiff alleges that the situation was extremely emotionally taxing for him. Even before being told he was the father, plaintiff had been struggling with the guilt of engaging in a sexual relationship with a woman twice his age whom he had always known as a maternal figure. Once he became a part of Jane Roe's life, although he enjoyed his relationship with her, he felt intense anxiety over what he perceived to be the illicit nature of his life, and for a long time, he felt unable to talk to anyone about it except defendant. In 1990, the pressures forced plaintiff to begin seeing a therapist.

In the fall of 1992, plaintiff finally confided in a few of his friends and told them of his situation. Some of them questioned whether plaintiff was certain that he is the father and suggested that he get a paternity test. After considerable reluctance, defendant eventually allowed Jane Roe to be tested. The test showed conclusively that plaintiff was not the child's father.

Plaintiff's complaint alleges that defendant dramatically altered plaintiff's life by drawing him into her scheme. In addition to the anxiety plaintiff felt as a result of having this child but being unable to tell his friends and family, the complaint alleges that his sense of guilt and obligation interfered with his ability to forge relationships with other women. He also abandoned his goal of working for an advertising agency in San Francisco because he wanted to be a good father for Jane Roe.

Plaintiff's original complaint contained three counts. Count I alleged fraud; count II alleged intentional infliction of emotional distress; and count III sought a mandatory injunction that Jane Roe be told the truth and that plaintiff be granted visitation rights with Jane Roe.

Defendant moved to dismiss the complaint pursuant to Illinois Code of Civil Procedure sections 2—615 and 2—619. 735 ILCS 5/2—615, 5/2—619 (West 1994). Defendant claimed that counts I and II were barred by the applicable statutes of limitations. She asserted that the limitations period began to run when plaintiff was first informed that he was the father because a reasonable person in the exercise of due diligence would have demanded a paternity test immediately. With respect to the equitable claim, defendant argued that plaintiff was not entitled to visitation because he was not a natural or adoptive parent and that his request for Jane Roe to be

informed of the truth was moot because she had already been told. Defendant attached an affidavit by her attorney that stated only that the attorney "will not attempt to summarize the conversation that took place between Jane and her mother, but simply to state that Jane has been told that Mr. Erik Koelle, the plaintiff in this matter, is not her father." Plaintiff requested a deposition of defendant's attorney to determine exactly what Jane Roe was told and under what circumstances, but the request was denied.

The trial court dismissed the equitable claim with prejudice, finding that plaintiff's request that Jane Roe be told the truth was moot and that plaintiff was not entitled to visitation. Plaintiff appealed that ruling. The court also dismissed the fraud and intentional infliction of emotional distress claims without prejudice, and granted plaintiff leave to file an amended complaint setting forth allegations sufficient to invoke the "discovery rule" by establishing that he did not fail to act with due diligence to discover his claim earlier.

Plaintiff filed a two-count amended complaint containing the facts summarized above. Again, count I alleged fraud, and count II alleged intentional infliction of emotional distress. Defendant again filed a motion to dismiss, citing the five-year statute of limitations for fraud (735 ILCS 5/13—205 (West 1994)) and the two-year statute of limitations for intentional infliction of emotional distress. 735 ILCS 5/13—202 (West 1994). The motion also asserted that plaintiff failed to state a claim upon which relief could be granted. The trial court held that plaintiff should have reacted with skepticism when he was first told he was the father, and, therefore, his claims were barred by the respective statutes of limitations. The court also found, in the alternative, that plaintiff failed to state a claim upon which relief could be granted because "love and affection" are "noncompensable." Plaintiff again appealed, and the two appeals were consolidated by order of this court.

## A. EQUITABLE RELIEF

Plaintiff contends that the trial court erred in dismissing his claim for equitable relief, which consists of two parts. The first part seeks a mandatory injunction ordering that Jane Roe be told plaintiff is not her father. Plaintiff claims that in ruling that the claim is moot, the trial court improperly relied on the conclusory affidavit of defendant's attorney without allowing plaintiff an opportunity to depose the affiant.

■ It is clear that a court may consider affidavits submitted in connection with a section 2—619 motion to dismiss. 735 ILCS 5/2—619 (a) (West 1994). However, the affidavit must conform to the

requirements of Illinois Supreme Court Rule 191(a). 134 Ill. 2d R. 191(a). Rule 191(a) provides that such affidavits "shall set forth *with particularity* the facts upon which the *** defense is based." (Emphasis added.) 134 Ill. 2d R. 191(a). Here, the defense of mootness is based on a conversation between defendant and Jane Roe in which the affiant contends that the child was told plaintiff is not her father. The affidavit states only that the affiant "will not attempt to summarize the conversation that took place between Jane and her mother, but simply to state that Jane has been told that Mr. Erik Koelle, the plaintiff in this matter, is not her father." The affidavit failed to describe "with particularity" what the child was told and under what circumstances and conditions the conversation took place. Therefore, the affidavit is insufficient, and the trial court erred in relying on it.

■ The second part of plaintiff's claim for equitable relief seeks an order granting plaintiff visitation rights with Jane Roe. In dismissing this claim, the trial court held that Illinois law does not recognize visitation rights for a nonparent. The court stated simply that it agreed with the position taken by defendant in her motion to dismiss, which argued that neither the Illinois Parentage Act of 1984 (750 ILCS 45/2 (West 1994)) nor the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601, 602 (West 1994)) allows a nonparent to seek visitation with a child.

While it is true that these statutes do not provide the grounds for plaintiff's claim for visitation privileges in this case, Illinois case law and general principles of equity support the claim. In *In re Custody of Townsend*, 86 Ill. 2d 502, 427 N.E.2d 1231 (1981), the Illinois Supreme Court acknowledged the presumption that the right of a natural parent to care for a child is superior to the right of a third party, but held that this presumption is "not absolute and serves only as one of several factors used by courts in resolving the ultimately controlling question of where the best interests of the child lie." *Townsend*, 86 Ill. 2d at 508, 427 N.E.2d at 1234. The court did not provide a list of such factors, but instead instructed that this standard "is a simple one designed to accommodate the often complex and unique circumstances of a particular case." *Townsend*, 86 Ill. 2d at 508, 427 N.E.2d at 1234.

Therefore, awarding custody or visitation rights to a nonparent over the objection of a natural parent is permissible if it would be in the best interests of the child. In *In re Marriage of Roberts*, 271 Ill. App. 3d 972, 649 N.E.2d 1344 (1995), the petitioner was led by his wife to believe that he was the father of her child, and he developed a loving father-son relationship with the child. Three years later,

during divorce proceedings, the petitioner discovered that in fact he was not the father. Still, he continued to seek custody of the child. The circuit court applied an "equitable parent" doctrine and awarded custody to the petitioner. *Roberts*, 271 Ill. App. 3d at 980, 649 N.E.2d at 1349. The appellate court found that awarding custody to the petitioner was permissible even though he was not the natural or adoptive father, but that the equitable parent doctrine was not the appropriate standard. *Roberts*, 271 Ill. App. 3d at 980, 649 N.E.2d at 1349. Rather, the circuit court should have applied the best interests of the child standard enunciated in *Townsend. Roberts*, 271 Ill. App. 3d at 980, 649 N.E.2d at 1349. Therefore, the court held "we understand the concerns of the trial court and hold that on remand the circuit court is not barred by the superior rights doctrine from awarding custody to petitioner." *Roberts*, 271 Ill. App. 3d at 980, 649 N.E.2d at 1349-50.

Here, as in *Roberts*, plaintiff claims he was deceived into believing he was Jane Roe's father and, consequently, developed a mutually loving and nurturing relationship with her. He claims that maintaining that relationship is in her best interests so long as she assents. We find that the trial court erred in ruling that because the Illinois Parentage Act and the Illinois Marriage and Dissolution of Marriage Act do not authorize visitation privileges for a nonparent, plaintiff is not entitled to such privileges. Under *Townsend* and *Roberts*, the trial court should determine whether Jane Roe wants to see plaintiff and whether visitation with plaintiff would be in her best interests. If these questions are answered in the affirmative, then visitation should be ordered.

Visitation by nonparents was found to be in the best interests of the child in *In re Ashley K.*, 212 Ill. App. 3d 849, 571 N.E.2d 905 (1991), *appeal denied*, 141 Ill. 2d 541, 580 N.E.2d 115 (1991). In that case, Ashley was born to drug-addicted parents and placed with a foster family by the Illinois Department of Children and Family Services. Five years later, the natural parents filed a petition seeking to regain custody of Ashley, and the foster family requested an order of visitation if the petition was granted. The appellate court found that reliable expert psychological testimony indicated that separation from the foster family without visitation would only contribute to this highly disturbing experience for the child and would be a "terrible tragedy." *Ashley K.*, 212 Ill. App. 3d at 889, 571 N.E.2d at 929-30. The court stated that "to deny Ashley visitation with the people who were her *de facto* parents for the first five years of her life [would] defy sound practical judgment." *Ashley K.*, 212 Ill. App. 3d at 889, 571 N.E.2d at 930. Therefore, the court remanded the case to the

trial court with instructions to order visitation with the foster family. *Ashley K.*, 212 Ill. App. 3d at 890, 571 N.E.2d at 930.

Although plaintiff in this case was not a foster parent in exclusive custody of Jane Roe for five years, plaintiff and Jane Roe loved each other as father and daughter for eight years. Plaintiff's request for visitation rights is conditional upon Jane Roe's consent. We find that the trial court erred in denying such visitation without first hearing testimony from competent experts and determining whether Jane Roe wants to see plaintiff. Clearly, the revelation that plaintiff is not her father is a great shock that may be very disturbing for the child. No purpose would be served, no statute complied with, and no public policy implemented if this court added to her despair by depriving Jane Roe of her relationship with plaintiff.

Therefore, we reverse the trial court's dismissal of plaintiff's equitable claim and remand the case to the trial court with instructions to disregard the affidavit of defendant's attorney, and to grant plaintiff visitation privileges if such an arrangement would be in Jane Roe's best interests.

## B. STATUTE OF LIMITATIONS

The trial court found that the limitations periods of five years for fraud and two years for intentional infliction of emotional distress began to run when defendant told plaintiff he was the father. The trial court's ruling was in error.

■ Statutes of limitations are intended to prevent unnecessary delay in bringing a claim by barring the claim after a certain period has elapsed. *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 61 Ill. 2d 129, 137, 334 N.E.2d 160, 164 (1975). The "discovery rule" was adopted to alleviate the harsh consequences of a statute of limitations by postponing the starting of the period until the injured party knew or should have known of his injury. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 414, 430 N.E.2d 976, 979 (1981). When a plaintiff asserts the discovery rule in response to a statute of limitations defense, the burden is on the plaintiff to show that the rule applies. *Ruklick v. Julius Schmid, Inc.*, 169 Ill. App. 3d 1098, 1108, 423 N.E.2d 1208, 1214 (1988).

■ Here, the trial court ruled that plaintiff should have responded to defendant's "accusation of fatherhood" by demanding a paternity test, because "[i]t is probably the essence of maleness to regard the dangers of false claims of fatherhood skeptically, particularly when one engages in sexual activity with a person who tells the male that she can't get pregnant." We reject the trial court's definition of "maleness."

The question of when an injured party knows or should know of his injury is normally a question of fact for the jury. *Knox College*, 88 Ill. 2d at 416, 430 N.E.2d at 981. A court can substitute its judgment for that of the jury only where it is apparent from the undisputed facts that only one conclusion can be drawn. *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874 (1981). Here, plaintiff was half defendant's age and inexperienced in relationships. He spent his adolescent years thinking of defendant as a trusted maternal figure to whom he could always turn with the concerns teenagers typically express to their parents. Defendant seduced plaintiff by inviting him onto her boat, presenting a bottle of tequila, and initiating sexual activity. Knowing that plaintiff felt ashamed of his affair with her and that he had unwavering trust and confidence in her, defendant told plaintiff he was Jane Roe's father. She told him that she had consulted with her doctor, and the date of conception had been pinned down to the weekend they spent together. Furthermore, she asked for no financial support from him. We find that the allegations in plaintiff's complaint, if proven, could easily convince reasonable minds that defendant's scheme was so deceptive and well implemented that plaintiff had no reason to suspect defendant might be lying. The trial court erred in taking the issue out of the hands of the jury.

The trial court apparently believed that because defendant had told plaintiff that she could not become pregnant, plaintiff should have been skeptical when she told him he was the father. However, defendant's claimed infertility is irrelevant; obviously she was wrong. We do not believe that her statement has any bearing on whether plaintiff should have questioned whether he was the father.

Defendant cites three Illinois cases, which she claims support her position that plaintiff should have been suspicious. In *Ptaszek v. Michalik*, 238 Ill. App. 3d 72, 606 N.E.2d 115 (1992), the plaintiff had previously "actively pursued" a judgment of paternity and was, therefore, barred by principles of *res judicata* from seeking to avoid child support obligations three years later when he discovered the mother was wrong when she told him he was the father. *Ptaszek*, 238 Ill. App. 3d at 73-76, 606 N.E.2d at 117-18. Here, there was no prior judgment that might have had a preclusive effect on this action. Furthermore, the *Ptaszek* court also found that there was no evidence that the mother deliberately lied when she told the plaintiff he was the father. *Ptaszek*, 238 Ill. App. 3d at 78, 606 N.E.2d at 119. Here, plaintiff's complaint clearly alleges that defendant deliberately lied and that her deceptiveness and manipulation in implementing her scheme left plaintiff with no reason to suspect she was lying.

*In re Marriage of O'Brien*, 247 Ill. App. 3d 745, 617 N.E.2d 873 (1993), is also inapposite. There, the defendant, plaintiff's wife, had a baby and told plaintiff he was the father. Plaintiff admitted that he suspected at the time that his wife might have had an affair and that someone else might have been the father of the child, but he did not take a paternity test. Three years later, plaintiff and defendant separated and entered into a divorce agreement that provided that defendant would retain custody of the child and that plaintiff would have visitation rights and provide child support. About two years later, plaintiff demanded a paternity test, which showed that he was not the father, and he brought an action seeking to recover his child support payments. *O'Brien*, 247 Ill. App. 3d at 746-47, 617 N.E.2d at 874. The court found that the discovery rule did not apply since plaintiff always suspected he was not the father and, therefore, the claim was barred by the two-year statute of limitations contained in the Illinois Parentage Act. *O'Brien*, 247 Ill. App. 3d at 749, 617 N.E.2d at 875. Here, plaintiff never actually suspected defendant's scheme until he demanded a paternity test. Therefore, the logic in *O'Brien* does not apply. The question is whether plaintiff *should have* been suspicious, and as discussed above, this question should have been left to the jury.

Finally, in *Kapp v. Alexander*, 218 Ill. App. 3d 412, 578 N.E.2d 285 (1991), the putative father brought an action seeking a determination of paternity and custody or visitation privileges. *Kapp*, 218 Ill. App. 3d at 413, 578 N.E.2d at 285. In a simple application of the statute of limitations in the Illinois Parentage Act, the court found that the action was time barred. *Kapp*, 218 Ill. App. 3d at 417, 578 N.E.2d at 288. *Kapp* did not even address the discovery rule, and it has no application here.

Because reasonable minds could find that plaintiff had no reason to suspect defendant of perpetrating such a scheme, the question should have been left to the jury. Therefore, the trial court erred in ruling that the fraud and intentional infliction of emotional distress claims are barred by the statutes of limitations.

## C. STATING A CLAIM

The trial court also found that plaintiff's claims for fraud and intentional infliction of emotional distress fail because "love and affection" are "noncompensable." However, the trial court misapprehends the nature of plaintiff's claim. Plaintiff does not seek to be paid for the love and affection he gave Jane Roe. In fact, his complaint expresses his desire to continue that relationship.

■ The complaint alleges that plaintiff suffered severely as a

result of defendant's allegedly fraudulent scheme. Plaintiff alleges that he experienced constant intense anxiety, developed difficulty dealing with women and cultivating relationships, and abandoned his career goals. These are the injuries for which plaintiff seeks to recover. The trial court erred in suggesting that plaintiff seeks to be compensated for loving Jane Roe. He seeks compensation for the losses he has suffered due to defendant's alleged fraud and for the pain and anxiety he has felt due to her alleged intentional infliction of emotional distress.

█ Defendant claims that public policy disfavors plaintiff's lawsuit because "intrafamilial warfare" may be harmful to the child. See *Richard P. v. Superior Court*, 202 Cal. App. 3d 1089, 249 Cal. Rptr. 246 (1988). We believe that any harm Jane Roe may have suffered from this alleged situation would have been caused by defendant. Jane Roe's real father is dead, and now defendant will not allow her to see the only father she ever knew. If anything, plaintiff's lawsuit seeks to limit the harm caused with equitable relief entitling plaintiff and Jane Roe to continue their loving father-daughter relationship.

We find that public policy does not serve to protect people engaging in behavior such as that with which plaintiff's complaint charges defendant, and we will not allow defendant to use her daughter to avoid responsibility for the consequences of her alleged deception.

For the foregoing reasons, the judgment of the trial court is reversed on all counts, and the case is remanded for proceedings consistent with this opinion.

Reversed and remanded.

CAMPBELL, P.J., and WOLFSON, J., concur.