835 So.2d 1241 (2003)
Dorothy MAGWOOD, as Personal Representative of the Estate of Anderson Lee Tate, Jr., Appellant,
v.
Anderson Lee TATE, Sr., and Elijah White, Appellees.
No. 4D01-3785.
District Court of Appeal of Florida, Fourth District.
January 29, 2003.
*1242 Jennifer S. Carroll and John M. Porter of Law Offices of Jennifer S. Carroll, P.A., Palm Beach Gardens, and Ronald L. Cason of Law Offices of Ronald L. Cason, Fort Pierce for appellant.
Deborah A. Sawyer, Fort Pierce, for appellee Anderson Lee Tate, Sr.
GROSS, J.
The issue in this case is whether the law will find unjust enrichment to create a contract implied in law that visits the sins of the parents upon their child. We hold that no contract implied in law arises and reverse the final judgment.
This case grew out of the relationship between Virginia Barrett and Anderson Lee Tate, Sr. ("Tate, Sr."). Barrett met Tate, Sr. around 1969. He was sixteen and she was about the same age. At the time they met, she already had a child. Barrett and Tate, Sr. lived together from 1969 to 1978. They never married. By 1972, the couple had two daughters, Lawanna and Ayanna.
Anderson Lee Tate, Jr. ("Tate, Jr.") was born on August 15, 1974. Barrett told Tate, Sr. that he was the father of the boy. Tate, Sr.'s name was listed as the father on the birth certificate. After the boy was born, Tate, Sr. left his job as a migrant worker and began a truck driving job. He participated in Tate, Jr.'s care by diapering him, cleaning him, dressing him, and taking him places.
Barrett and Tate, Sr. separated. In 1979, Barrett filed for public assistance; her application named Elijah White as Tate, Jr.'s father. In connection with the welfare proceeding, White was adjudicated as Tate, Jr.'s father and ordered to pay child support of $25 per month. Tate, Sr. was unaware of these proceedings or that White had been ordered to pay child support.
In 1981 or 1982, Tate, Sr. resumed his previous job as a migrant worker. He traveled to other states for three to six months a year. When he was home in Fort Pierce, Barrett's children, including Tate, Jr., visited him and he often gave them $10 to $50. He also bought the children clothes, bicycles, and tricycles.
Tate, Jr. died on December 3, 1996. Tate, Sr. was named as Tate, Jr.'s father on the death certificate, in the funeral program, and in the obituary.
As a result of a settlement of a wrongful death lawsuit, Tate, Jr.'s estate recovered $1,822,499.00. Under the terms of the settlement, 70% of the funds were awarded to the estate and Tate, Jr.'s minor son, 15% to the mother, and 15% to the father. A DNA blood test excluded Tate, Sr. as Tate, Jr.'s biological father. Tate, Jr.'s birth and death certificates were amended to reflect that Elijah White was the biological father.
Tate, Sr. filed suit against Barrett, White, and Dorothy Magwood, as personal representative of the estate of Tate, Jr. The basis of the claim against the estate was "reimbursement under the theory of unjust enrichment" for "support, services, the value of comfort, affection, and enjoyment of life, given to decedent" Tate, Jr. until his death. After a trial, a jury awarded $130,000 in damages against the estate.
The issue here is whether Tate, Sr. recovered on a valid cause of action against the estate.[1]
*1243 Tate, Sr.'s claim for "reimbursement under the theory of unjust enrichment" was one for a contract implied in law, also known as a quasi contract. As we wrote in Commerce Partnership 8098 Limited Partnership v. Equity Contracting Co., 695 So.2d 383, 386 (Fla. 4th DCA 1997):
A contract implied in law, or quasi contract, is not based upon the finding, by a process of implication from the facts, of an agreement between the parties. A contract implied in law is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct. The fiction was adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation. The elements of a cause of action for a quasi contract are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.
(Citations omitted).
"[C]onsiderations of equity and morality play a large part in the process of finding a promise by inference of fact as well as in constructing a quasi contract without any such inference at all." 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.20(a) (Joseph M. Perillo ed., 1993). These considerations come to bear in analyzing the fourth element of a contract implied in law, whether it is "inequitable for the defendant to retain" a benefit received "without paying fair value for it."
To evaluate Tate, Sr.'s claim against the estate it is essential to understand that the estate stands in the shoes of Tate, Jr. In Sullivan v. Sessions, 80 So.2d 706, 707 (Fla.1955), the supreme court held that a personal representative of an estate stands in the shoes of the decedent, so a person has no greater rights against the estate than the person would have had against the decedent during his lifetime. Thus, Tate, Sr.'s claim here is no different than a father's claim against a living child to recover for child support paid under a mistaken belief that he owed a father's duty to the child.
Here, there is no cause of action for a contract implied in law because it is inequitable to force the child to reimburse the mistaken father. The child was under no obligation to support himself. Tate, Sr. discharged the duty of the biological father, Elijah White, not that of the child. It was not the fault of the child that he was born into the midst of a family where his paternity was so uncertain.
Until Tate, Jr. was about five years old, Tate, Sr. lived in the home as part of the family unit with Barrett and her three other children, two of which were fathered by Tate, Sr. It cannot be said that Tate, Jr. ever accepted benefits under circumstances where justice requires him to make repayment. See McLane v. Musick, 792 So.2d 702, 705 (Fla. 5th DCA 2001) (holding that law will not create contract implied in fact for services rendered by and for members of the same family or relatives who live together). We cannot hold Tate, Jr. liable for things that happened when he was a child between the adults who were charged with taking care of him. See RESTATEMENT OF RESTITUTION § 62 (1988). That the estate is now flush *1244 with cash does not create an obligation to reimburse Tate, Sr.; the circumstances giving rise to the wrongful death settlement were unrelated to the conduct upon which Tate, Sr. bases his cause of action.
Our research has disclosed no case holding a child responsible to a mistaken parent under these circumstances. Courts are not inclined to allow contracts implied in law for the recovery of child support paid under mistake, even against parties who created the situation that gave rise to the lawsuit.
In Day v. Heller, 264 Neb. 934, 653 N.W.2d 475 (2002), a man sued a mother for her misrepresentation of his biological fatherhood of a child born during their marriage. After the couple divorced, DNA testing conclusively established that the man was not the biological father of the child. Id. at 477. One count of the man's suit against the mother was for assumpsit, a contract implied in law, based on unjust enrichment. Id. The supreme court of Nebraska held that this cause of action was against public policy:
As we read his petition, [the man's] fraud and assumpsit claims are for [the mother's] misrepresentation that led [the man] to make investments of time, emotion, and money in [the child] that he would not have made had he known that [the child] was not his biological son. In effect, [the man] is saying, "He is not my son; I want my money back." [The man's] fraud and assumpsit causes of action focus on the burdens of the parent-child relationship.... We do not believe that having a close and loving relationship "imposed" on one because of a misrepresentation of biological fatherhood is the type of "harm" that the law should attempt to remedy.
Id. at 479. If public policy precludes a suit against the mother who misled the would-be father into paying child support, it obviously prevents a suit against the child.
Smith v. Ohio Department of Human Services, 103 Ohio App.3d 149, 658 N.E.2d 1100 (1995), involved a suit by a man who was misled by a woman into admitting paternity for a child. Because the mother received public assistance, child support payments were collected by the Ohio Department of Human Services ("ODHS"). After genetic testing excluded the man as the father of the child, he brought suit against ODHS seeking restitution for the child support collected from him. The Ohio court held that the man was not entitled to restitution, in part because ODHS had committed no wrongdoing in following the dictates of a paternity judgment. As the court observed, "the hard truth is that the unjust impoverishment which [the man] has suffered does not necessarily correspond to any unjust enrichment on the part of the state." Id. at 1101. Like ODHS in Smith, Tate, Jr. did not cause Tate, Sr.'s mistaken payments.
For these reasons, we reverse the final judgment and remand to the trial court with instructions to enter judgment in favor of Magwood.
SHAHOOD, J., and MAASS, ELIZABETH T., Associate Judge, concur.
NOTES
[1] The estate preserved this issue for appellate review. It raised the defense of failure to state a cause of action in an omnibus pleading, including a motion to dismiss and affirmative defenses filed on December 15, 1999. See Fla. R. Civ. P. 1.140(h)(2). The issue was again broached in a motion and amended motion for summary judgment.