ROBERT E. DAY, JR., APPELLANT, V.
ROBIN E. HELLER, APPELLEE.
653 N.W.2d 475

Filed November 22, 2002.   No. S-00-928.

John W. Ballew, Jr., of Ballew, Schneider & Covalt, for appellant.

Robert F. Peterson and Mark L. Laughlin, of Laughlin, Peterson & Lang, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

This appeal presents the question whether we will recognize a tort or assumpsit cause of action against a mother for her misrepresentation of biological fatherhood. Robert E. Day, Jr., alleges that for 12 years, his former wife, Robin E. Heller, represented that Robert was the biological father of a child born during their marriage. Robert now seeks damages for fraud, assumpsit, and intentional infliction of emotional distress. The district court entered summary judgment for Robin.

The Nebraska Court of Appeals reversed, holding that neither res judicata nor collateral estoppel barred Robert's action. *Day v. Heller*, 10 Neb. App. 886, 639 N.W.2d 158 (2002). The Court of Appeals' decision impliedly recognized tort and assumpsit causes of action for a mother's misrepresentation of biological fatherhood. Because we determine that Robert's tort and assumpsit causes of action are contrary to public policy, we reverse.

## BACKGROUND

Robert and Robin married on August 30, 1986, and on July 14, 1987, Robin gave birth to a child, Adam. On May 31, 1991, the marriage was dissolved. Robin was granted custody of Adam, subject to Robert's reasonable visitation rights. The court ordered Robert to pay child support in the initial amount of $270 per month and to provide medical insurance coverage for Adam. According to Robert's petition, the trial court entered subsequent orders increasing Robert's child support obligation and requiring him to pay one-half of Robin's employment-related daycare costs for Adam. Also, the court entered a modification order in which Robert was ordered to pay one-half of Adam's uninsured medical expenses. Robert also alleged that he paid legal fees for enforcement of his visitation rights.

Robert alleged that at all times following Adam's birth, Robin represented to him that he was Adam's biological father. According to Robert's answers to Robin's interrogatories, Robin misled him as to the due date for Adam's birth, telling him that Adam was due 3 weeks before his actual due date. Robert alleges that it was not until July 1997, following the birth of his daughter with his current wife, that he first became suspicious of whether he was Adam's biological father. According to

Robert, it was at this time that a doctor told him " 'there is no reason to let a healthy baby and mom go over term in a pregnancy.' " This statement led Robert to count back from the time of Adam's birth to the likely time of conception. Robert realized that Adam's conception "would have taken place while [Robert] had been away from [Robin] for several weeks." Robert sought DNA testing in April 1999. (The record does not show how this was accomplished.) The testing, according to Robert's allegations, showed a 0-percent probability that Robert was Adam's father. Robert also alleged that he could not have, through due diligence, discovered before April 1999 that he was not Adam's biological father.

On May 19, 1999, Robert consented to the adoption of Adam by Robin's new husband, Patrick Heller. On July 27, Patrick adopted Adam.

On February 15, 2000, Robert filed the present action. Robert pled three causes of action. In his first cause of action, fraud, Robert alleged that Robin had intentionally and willfully concealed that another man was Adam's biological father; that Robin misrepresented and concealed Adam's biological parentage with the intention that Robert would rely on it, which he did; and that as a direct and proximate result of Robin's concealment, he suffered damages.

In his second cause of action, assumpsit, Robert alleged that since the entry of the decree in 1991, he had paid child support, employment-related daycare expenses, and health insurance for Adam. Robert alleged that because he is not Adam's biological father, Robin has been unjustly enriched, and that fairness and justice require Robin to repay him.

In his third cause of action, emotional distress, Robert alleged that Robin intentionally and recklessly misrepresented that Robert was Adam's father when she knew this was false and that she continued to conceal the fact from Robert; that Robin's conduct in misrepresenting and concealing the true paternity of Adam for nearly 12 years was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency; and that given the emotional bond that he formed with Adam, he suffered and continues to suffer emotional distress.

Robert sought damages for the following: (1) amounts he paid under the original and modified decree for child support, daycare costs, health insurance, and medical expenses; (2) costs he paid to exercise and enforce his visitation privileges with Adam; (3) general damages for Robin's alleged intentional infliction of emotional distress; and (4) attorney fees incurred in the present action.

Robin moved for summary judgment. The district court rejected Robin's argument that under res judicata and collateral estoppel, the recital of paternity in the dissolution decree barred Robert's claims. But, the court concluded that there were no genuine issues of material fact for each of Robert's causes of action and that Robin was therefore entitled to judgment as a matter of law. Robert appealed.

The Court of Appeals reversed. *Day v. Heller*, 10 Neb. App. 886, 639 N.W.2d 158 (2002). It determined that the trial court, instead of deciding whether any real issue of material fact existed, had attempted to decide the factual issues. It also determined that neither res judicata nor collateral estoppel barred Robert's action. The Court of Appeals noted that whether, after a dissolution proceeding has become final, a party can bring a tort action against a former spouse is an issue of first impression in Nebraska and concluded that such an action should be allowed. *Id.* In reversing, the Court of Appeals implicitly recognized that a party could maintain tort and assumpsit actions against a mother for her misrepresentation of biological fatherhood. We granted Robin's petition for further review.

## ASSIGNMENTS OF ERROR

Robin assigns that the Court of Appeals erred in determining that (1) res judicata and collateral estoppel do not bar Robert's claims and (2) factual issues exist which preclude summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the

moving party is entitled to judgment as a matter of law. *McCarson v. McCarson*, 263 Neb. 534, 641 N.W.2d 62 (2002).

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefits of all reasonable inferences deducible from the evidence. *Id.*

In an appellate review, the grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon. *Foreman v. AS Mid-America*, 255 Neb. 323, 586 N.W.2d 290 (1998).

## ANALYSIS

The Court of Appeals noted that whether a party can bring a tort claim against a former spouse after a dissolution proceeding has become final is a question of first impression in Nebraska. Nebraska abolished the interspousal tort immunity in *Imig v. March*, 203 Neb. 537, 279 N.W.2d 382 (1979), and we agree with the Court of Appeals that a tort action against a former or current spouse is not inherently prohibited. This case, however, turns on a different question, Will Nebraska recognize a tort or assumpsit cause of action against a mother for her misrepresentation and concealment of biological fatherhood? Because we conclude that Robert's tort and assumpsit causes of action are contrary to public policy, we need not address Robin's res judicata and collateral estoppel arguments.

Robert's causes of action can be subdivided into two categories. The first consists of his fraud and assumpsit claims. These claims seek to recover for the creation of Robert's parent-child relationship with Adam. The second consists of Robert's intentional infliction of emotional distress claim. Liberally construed, this claim seeks to recover for the emotional harm suffered when a misrepresentation of biological fatherhood leads to the threatened destruction of a parent-child relationship. Because the two categories present different policy questions, we analyze them separately.

### ROBERT'S FRAUD AND ASSUMPSIT CAUSES OF ACTION

Robert's fraud claim seeks to recover the child support he was ordered to pay under the dissolution and supplemental

decrees and the costs associated with the enforcement of his visitation rights. Similarly, Robert's assumpsit claim is for Robin's unjust enrichment as a result of receiving child support payments. We conclude that Robert's fraud and assumpsit causes of action are contrary to public policy.

As we read his petition, Robert's fraud and assumpsit claims are for Robin's misrepresentation that led Robert to make investments of time, emotion, and money in Adam that he would not have made had he known that Adam was not his biological son. In effect, Robert is saying, "He is not my son; I want my money back." Robert's fraud and assumpsit causes of action focus on the burdens of the parent-child relationship, while ignoring the benefits of the relationship. We do not believe that having a close and loving relationship "imposed" on one because of a misrepresentation of biological fatherhood is the type of "harm" that the law should attempt to remedy. See *Nagy v. Nagy*, 210 Cal. App. 3d 1262, 258 Cal. Rptr. 787 (1989).

Moreover, a tort or assumpsit claim that seeks to recover for the creation of a parent-child relationship has the effect of saying "I wish you had never been born" to a child who, before the revelation of biological fatherhood, was under the impression that he or she had a father who loved him or her. Accord Linda L. Berger, *Lies Between Mommy and Daddy: The Case for Recognizing Spousal Emotional Distress Claims Based on Domestic Deceit That Interferes With Parent-Child Relationships*, 33 Loy. L.A. L. Rev. 449 (2000) (advocating tort where misrepresentation of biological fatherhood threatens existing parent-child relationship, but questioning tort that allows recovery for creation of parent-child relationship). We decline to allow a party to use a tort or assumpsit claim as a means for sending or reinforcing this message.

### ROBERT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CAUSE OF ACTION

For his intentional infliction of emotional distress claim, Robert alleges:

2. Defendant intentionally and recklessly represented to Plaintiff after the birth of Adam Robert Day that Plaintiff was the father of said child when in fact Defendant knew

that Plaintiff was not the father of said child and continued to conceal this fact from Plaintiff.

3. Defendant's conduct in misrepresenting and concealing the true paternity of Adam Robert Day to Plaintiff for nearly twelve years was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency so as to be considered utterly intolerable.

4. As a result of Defendant's conduct and subsequent revelation that he is not the biological father of Adam Robert Day, Plaintiff has suffered and continues to suffer emotional distress given the emotional bond he formed with this child over a twelve year period.

5. Defendant's initial misrepresentation and concealment of the true paternity of this child over a twelve year period while accepting court ordered child support, employment-related daycare expense, health insurance and other economic benefits on the part of the child while at the same time preventing Plaintiff from exercising visitation rights with said child and causing Plaintiff to incur significant attorney fees in doing so constitutes outrageous conduct so severe that no reasonable person should be expected to endure it.

Paragraph 5 mirrors Robert's fraud and assumpsit claim. With this allegation, Robert is seeking to recover for nothing more than the anger he felt when he learned that he had made investments in Adam that he would not have made had he known there was no biological relationship. To the extent Robert's intentional infliction of emotional distress claim seeks to recover for the creation of a parent-child relationship, it is barred for the same reasons that his fraud and assumpsit claims are barred. See *Nagy v. Nagy, supra.*

■ Robert's intentional infliction of emotional distress cause of action is subject however to a second interpretation which raises different policy questions. "[I]n actions not involving extraordinary remedies, general pleadings are to be liberally construed in favor of the pleader." *Fitzpatrick v. U S West, Inc.,* 246 Neb. 225, 229, 518 N.W.2d 107, 112 (1994). Thus, we also consider this second interpretation of Robert's intentional infliction of emotional distress claim.

Liberally construed, paragraphs 2 through 4 of Robert's intentional infliction of emotional distress claim seek recovery for the emotional harm Robert suffered when Robin's misrepresentation and concealment of biological fatherhood threatened to destroy his parent-child relationship with Adam. In other words, Robert's petition can be read as saying that before he learned he was not Adam's father, he and Adam had a loving relationship; that learning the truth damaged this relationship; and that as a result of the damage to the relationship, Robert suffered severe emotional distress.

Whether to recognize an intentional infliction of emotional distress claim for the threatened destruction of a parent-child relationship presents a more difficult question than whether to recognize a claim for the creation of a parent-child relationship. Having a close and loving parent-child relationship suddenly destabilized by a revelation that there is no biological relationship has the potential to cause grief, anxiety, shock, and fear. Linda L. Berger, *Lies Between Mommy and Daddy: The Case for Recognizing Spousal Emotional Distress Claims Based on Domestic Deceit That Interferes With Parent-Child Relationships*, 33 Loy. L.A. L. Rev. 449 (2000). However, " '[i]t does not lie within the power of any judicial system . . . to remedy all human wrongs . . . [and to] attempt to correct such wrongs or give relief from their effects "may do more social damage than if the law leaves them alone." . . .' " *Nagy v. Nagy*, 210 Cal. App. 3d 1262, 1269, 258 Cal. Rptr. 787, 790-91 (1989). Not surprisingly, other courts have reached conflicting conclusions in deciding whether to recognize similar claims. Compare, e.g., *Doe v. Doe*, 358 Md. 113, 747 A.2d 617 (2000) (public policy bars tort claim against former spouse based on misrepresented paternity), *Nagy v. Nagy, supra* (Johnson, J., concurring), and *Steve H. v. Wendy S.*, 67 Cal. Rptr. 2d 90 (Cal. App. 1997), *superseded by* 946 P.2d 817, 68 Cal. Rptr. 2d 859, and *review dismissed and cause remanded* 960 P.2d 510, 77 Cal. Rptr. 2d 706 (1998), with *G.A.W. v. D.M.W.*, 596 N.W.2d 284 (Minn. App. 1999) (public policy is not bar), *Doe v. Doe*, 122 Md. App. 295, 712 A.2d 132 (1998), *rev'd* 358 Md. 113, 747 A.2d 617 (2000), and *Koelle v. Zwiren*, 284 Ill. App. 3d 778, 672 N.E.2d 868, 220 Ill. Dec. 51 (1996). See, also, Berger, *supra* (advocating extension of tort);

Robert G. Spector, *Marital Torts: The Current Legal Landscape*, 33 Fam. L.Q. 745 (1999) (questioning propriety of tort based on misrepresentations of biological fatherhood). Although persuasive arguments exist for both positions, we conclude that the law should not hold a mother liable in tort when her misrepresentation of paternity threatens an existing parent-child relationship.

Intentional infliction of emotional distress claims, like Robert's, present risks to the parties' child by unavoidably thrusting the child and his relationship with Robert into the center of the litigation. A child's emotional development and psychological well-being are tied to the level of conflict between the child's parents. See, *Steve H. v. Wendy S., supra*; Linda D. Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 Wm. Mitchell L. Rev. 495 (2001); Theresa Glennon, *Somebody's Child: Evaluating the Erosion of the Marital Presumption of Paternity*, 102 W. Va. L. Rev. 547 (2000). While we recognize that generally, the mere danger of parental conflict is not enough to bar an otherwise valid tort claim, see *Steve H. v. Wendy S., supra* (Vogel, J., dissenting), the tort Robert proposes presents a particularly unique brand of intrafamilial warfare. Unlike a case involving a battery or a car accident, the quality of the parent-child relationship will be at the center of the lawsuit. The closer the plaintiff was to the child before he learned that he was not the biological father, the greater the potential for disruption and the more likely that a disruption to the relationship would cause him severe emotional distress.

Because the tort necessarily places the quality of the parent-child relationship at its center, the child will become a focal point of litigation. In many cases, the mother will turn to the child to rebut the plaintiff's characterization of the parent-child relationship. As a result, the child will be subject to discovery concerning the nature of his or her relationship with the plaintiff and may even be called to testify at trial. The temptation for one party to manipulate the child's view of the other will be great, and we can conceive of the situation where the child " 'become[s] a strategic tool for advantageous use of one family member over another.' " See *Steve H. v. Wendy S.*, 67 Cal. Rptr. at 95 (quoting *Bock v. Lindquist*, 278 N.W.2d 326 (Minn. 1979)).

A custody dispute is the only other type of action that is between parents and has at its center the quality of a parent-child relationship. The negative consequences of a bitter custody battle are well established:

> Qualitative and quantitative research conducted over the past thirty years demonstrates that highly conflicted custody cases are detrimental to the development of children, resulting in perpetual emotional turmoil, depression, lower levels of financial support, and a higher risk of mental illness, substance abuse, educational failure, and parental alienation. The level and intensity of parental conflict is now thought to be the most dominant factor in a child's post divorce adjustment and the single best predictor of a poor outcome. Research shows that children exposed to violence and high levels of conflict "bear an acutely heightened risk of repeating the cycle of conflicted and abusive relationships as they grow up and try to form families of their own."

Linda D. Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 Wm. Mitchell L. Rev. 495, 496-97 (2001). Custody determinations, however, are a necessary adjunct to the resolution of a relationship turned sour. The legal system cannot force parents to stay together when they have made the decision to separate. The child's only option is to endure the bitterness of the custody battle.

But no similar compelling reasons exist for adopting an intentional infliction of emotional distress claim with the quality of the parent-child relationship at its center. Even advocates of the tort concede that it will not deter others from engaging in similar conduct:

> It may be especially unlikely that a spouse intent on preserving a marriage will be deterred from lying about the paternity of a child born during the marriage, or that a spouse intent on ending a marriage and winning custody will be deterred from telling the truth about the paternity of the child.

Linda L. Berger, *Lies Between Mommy and Daddy: The Case for Recognizing Spousal Emotional Distress Claims Based on Domestic Deceit That Interferes With Parent-Child Relationships,*

33 Loy. L.A. L. Rev. 449, 527 (2000). Moreover, although advocates of the tort claim that it affirms societal values, *id.*, we believe that it sends an incoherent message. We can conceive of the situation where a successful claimant executes a judgment lien on the mother's only automobile or garnishes the mother's wages. It would be inherently inconsistent to allow a person to premise a tort claim on his love for a child and then allow him to execute on property or garnish income necessary for that child's well-being.

Ultimately, the only valid reason for adopting the tort is to compensate the plaintiff for his emotional injury. We are not unsympathetic to a plaintiff who has been led to believe that a child is his when in fact the child is not. But, forced to choose between adopting a tort that carries all the detrimental effects of a custody battle or asking a plaintiff to go uncompensated for his emotional pain, we choose the latter.

## CONCLUSION

Because we conclude that Robert's fraud, intentional infliction of emotional distress, and assumpsit causes of action are contrary to public policy, Robin is entitled to summary judgment. Accordingly, we reverse the decision of the Court of Appeals and remand the cause to the Court of Appeals with directions to enter an order affirming the district court's entry of summary judgment for Robin.

REVERSED AND REMANDED WITH DIRECTIONS.