# IN THE SUPREME COURT OF IOWA

No. 11–1581

Filed June 1, 2012

**JOSEPH O. DIER,**

Appellant,

vs.

**CASSANDRA JO PETERS,**

Appellee.

_____

Appeal from the Iowa District Court for Grundy County, David F. Staudt, Judge.

A disestablished father appeals a district court order dismissing his common law action for fraud based on misrepresentation of paternity. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Barry S. Kaplan of Kaplan, Frese & Nine, Marshalltown, for appellant.

Lynn J. Wiese of Barker, McNeal, Wiese & Holt, Iowa Falls, for appellee.

**MANSFIELD, Justice**.

This case presents the question whether an individual who made voluntary expenditures based on a mother's fraudulent representation that he had fathered her child has a cause of action against the mother for recovery of those payments. Because we conclude that such a cause of action is consistent with traditional concepts of common law fraud, there is no prevailing public policy reason against recognizing such a cause of action, and Iowa's statutes do not speak to the issue, we hold that a cause of action may be pursued. Accordingly, we reverse the judgment of the district court granting the mother's motion to dismiss and remand for further proceedings.

## I.  Factual Background and Procedural History.

Because this case was decided on a motion to dismiss for failure to state a claim, we assume the factual allegations of the petition are true. O.D. was born to Cassandra Jo Peters on February 10, 2009. Peters knew that Joseph O. Dier was not the child's biological father, but nonetheless told Dier that he was. Based on the mother's representations, Dier provided financial support for the mother and the child.

Dier filed an application in the district court to establish custody of the minor child. After Peters received the report of the child custody evaluator, she was afraid she would not get custody of the child and requested a paternity test. That test excluded Dier as the biological father. Dier then requested a second paternity test which again excluded him as the biological father.

On August 2, 2011, Dier filed a separate petition at law seeking reimbursement from Peters of monies "expended to the Defendant, monies for the minor child, and monies expended in custody litigation."

On August 25, Peters moved to dismiss the petition. She asserted that Dier's petition "fail[ed] to state a claim upon which relief can be granted for the reason that the State of Iowa does not recognize an action for 'paternity fraud' nor has the Iowa Legislature created any such action by statute." Dier resisted the motion, arguing that Peters "engaged in fraudulent activity in enticing me to believe that I was the child's father and securing financial assistance from me from the beginning of the child's birth until recently." He asked that the district court "overrule the Motion to Dismiss as this matter is fraudulent and the Defendant has acted with utmost malice and hatred."

On September 20, 2011, the district court granted Peters' motion to dismiss. In its order dismissing Dier's action, the trial court concluded that the "current status of the law demands that this case be dismissed." Dier now appeals.

## II. Standard of Review.

We review a district court's ruling on a motion to dismiss for the correction of errors at law. *McGill v. Fish*, 790 N.W.2d 113, 116 (Iowa 2010). "We accept as true the facts alleged in the petition and typically do not consider facts contained in either the motion to dismiss or any of its accompanying attachments." *Id.*

## III. Analysis.

The sole issue on appeal is whether Iowa law allows a putative father to bring a paternity fraud action against a biological mother to obtain reimbursement of payments that were voluntarily made. "Paternity fraud," also known as "misrepresentation of biological fatherhood" or "misrepresentation of paternity," "occurs when a mother makes a representation to a man that the child is genetically his own even though she is aware that he is not, or may not be, the father of the

child." *Hodge v. Craig*, No. M2009–00930–COA–R3–CV, 2010 WL 4024990, at *12 & n.9 (Tenn. Ct. App. Oct. 13, 2010) (citation and internal quotation marks omitted), *appeal granted* (May 25, 2011). Numerous courts around the nation have considered whether a putative father may bring an independent claim for damages against a biological mother based on paternity fraud. *See Day v. Heller*, 653 N.W.2d 475 (Neb. 2002); *Miller v. Miller*, 956 P.2d 887 (Okla. 1998). Unlike here, paternity fraud claims frequently have been accompanied by claims of intentional infliction of emotional distress or have sought the reimbursement of court-ordered child support payments as damages. *See Day*, 653 N.W.2d at 77–78; *Miller*, 956 P.2d at 891, 905. Dier, however, seeks only reimbursement of payments that he made without court compulsion.

Courts in other jurisdictions are divided as to whether to recognize paternity fraud claims. Courts disallowing such claims have relied heavily on considerations of public policy and child welfare.[1] Courts

---

[1] *Nagy v. Nagy*, 258 Cal. Rptr. 787, 790–91 (Ct. App. 1989) (finding that an ex-husband's fraud claim based on the ex-wife's misrepresentation of paternity during the parties' marriage was barred by public policy); *Parker v. Parker*, 950 So.2d 388, 395 (Fla. 2007) (holding that a biological mother's misrepresentation of paternity during a dissolution of marriage proceeding constituted intrinsic fraud and thus res judicata precluded an independent action for compensatory damages for past and future child support obligations, while also suggesting that "a civil suit for compensatory damages is not the proper vehicle" for dealing with paternity fraud); *Doe v. Doe*, 747 A.2d 617, 623–24 (Md. 2000) (concluding that a putative father's claims seeking damages for fraud and intentional infliction of emotional distress resulting from the mother's misrepresentation of paternity during their marriage were barred by public policy); *Day*, 653 N.W.2d at 479, 482 (finding that public policy and child welfare concerns barred a putative father's fraud action seeking to recover child support payments he was ordered to pay based on his wife's misrepresentation that he was the child's biological father); *Pickering v. Pickering*, 434 N.W.2d 758, 761–62 (S.D. 1989) (determining that a putative father's action against his estranged wife for fraud and deceit arising from her conduct in intentionally failing to tell him that child born in wedlock was not his could not be maintained as matter of public policy as such matters were "not one[s] in which it is appropriate for the courts to intervene"); *Hodge*, 2010 WL 4024990, at *12 n.12 (reversing district court's award of child support, medical expenses, and insurance

allowing paternity fraud claims have concluded that paternity fraud is not dissimilar from any other tort claim and should be actionable provided the elements of the tort are met. *See G.A.W., III v. D.M.W.*, 596 N.W.2d 284, 290 (Minn. Ct. App. 1999). These courts have either discounted the public policy concerns or concluded that the interest in recompensing the putative father and discouraging paternity fraud outweighed the potential harm to the child.[2]

_____

premiums paid by putative father as well as stand-alone award of emotional distress damages while declining to "express an opinion on whether an award of compensatory damages for pecuniary losses not related to child support would have been affirmed"). Notably, many of these decisions involve alleged misrepresentations of paternity as to children who were born when the parties were married—a circumstance not present here.

[2] *Koelle v. Zwiren*, 672 N.E.2d 868, 878–89 (Ill. App. Ct. 1996) (holding that a putative father stated claims against a biological mother for fraud and intentional infliction of emotional distress based on misrepresentation of paternity and stating that "public policy does not serve to protect people engaging in" paternity fraud); *Denzik v. Denzik*, 197 S.W.3d 108, 113 (Ky. 2006) (holding that a putative father could recover child support payments previously made to his former wife because the support obligation arose from her fraudulent and years-long claim that he was the child's biological father); *Zink v. Zink*, 687 A.2d 229, 233 (Me. 1996) (reversing a lower court's dismissal of a putative father's separate action for misrepresentation of paternity without expressly reaching the validity of such a claim); *G.A.W., III*, 596 N.W.2d at 290 (concluding "there is no recognized legal barrier preventing a person from bringing fraud, misrepresentation, or infliction of emotional distress claims" based on misrepresentation of paternity and such claims are not against public policy); *Miller*, 956 P.2d at 896, 904–05 (holding that a tort action seeking damages for fraud and intentional infliction of emotional distress based on misrepresentation of paternity was not barred by the noncontestable statutory presumption of legitimacy but the putative father was not entitled to restitution of child support payments).

See also *State ex rel. P.M. v. Mitchell*, 930 P.2d 1284, 1289 (Alaska 1997) (allowing a paternity fraud victim to seek child support reimbursement from the state); *DiMichele v. Perrella*, No. CV106004536, 2011 WL 1026184, *6–9, 12 (Conn. Super. Ct. Feb. 23, 2011) (finding a putative father's causes of action against biological father based upon fraud, intentional infliction of emotional distress, and negligent infliction of emotional distress were actionable but his claim for child support reimbursement was not); *Cohen v. Nudelman*, 604 S.E.2d 580, 586 (Ga. Ct. App. 2004) (supporting paternity fraud claim against biological mother in dictum by stating that "[former husband] may have alleged a separate fraud claim sounding in tort" but did not); *Ghrist v. Fricks*, 465 S.E.2d 501, 507 (Ga. Ct. App. 1995) (supporting a paternity fraud claim against a biological mother by implication by holding that the putative father should not receive damages on his paternity fraud action *because* he prevailed on his paternity claim, and

Although the issue of whether to recognize a cause of action for paternity fraud is one of first impression in this court, we came close to addressing the subject eight years ago. In *Brooks v. Brooks*, No. 03–1217, 2004 WL 240207 (Iowa Ct. App. Feb. 11, 2004), the court of appeals decided an appeal from a district court's order granting summary judgment to the wife in a paternity fraud case brought by her estranged husband. The court of appeals quoted extensively from the Nebraska Supreme Court's decision in *Day*, which found that public policy and child welfare concerns precluded a fraud action. *Brooks*, 2004 WL 240207, at \*1–2 (citing *Day*, 653 N.W.2d at 479–481). Our court of appeals indicated that it found the reasoning in *Day* "persuasive" but ultimately declined "to decide whether such causes of action should be recognized in Iowa." *Id.* at \*2. The court concluded that it was "up to the legislature or our supreme court to establish new causes of action even when they appear to have merit." *Id.*

We granted further review. However, we deadlocked three-to-three and, thus, the district court's grant of summary judgment was affirmed by operation of law in a nonprecedential order. Order, *Brooks v. Brooks*, No. 03–1217 (Iowa Sept. 1, 2004); *see also* Iowa Code § 602.4107 (2011).

Although we have not previously determined the viability of a tort action for paternity fraud, we have held in a series of cases that parents cannot obtain retroactive relief from court-ordered child support. *See State ex rel. Baumgartner v. Wilcox*, 532 N.W.2d 774, 776–77 (Iowa 1995) (citing *In re Marriage of Shepherd*, 429 N.W.2d 145, 146–47 (Iowa 1988));

_____

it was clear that his primary objective was to remain the child's legal father and only sought tort damages in a counterclaim in case the ex-wife and avowed biological father prevailed on their paternity action).

*In re Evans*, 267 N.W.2d 48, 51–52 (Iowa 1978) (citing *Pucci v. Pucci*, 259 Iowa 427, 431–32, 143 N.W.2d 353, 356–57 (1966)); *Welch v. Welch*, 256 Iowa 1020, 1027–28, 129 N.W.2d 642, 646 (1964); *Delbridge v. Sears*, 179 Iowa 526, 536, 160 N.W. 218, 222 (1916)).

In *Wilcox*, after a putative father established that he was not the biological father, he sought to be relieved of "court-ordered obligations to pay past and future child support." 532 N.W.2d at 775. The central issue in that case was whether the putative father could be relieved of past accrued but unpaid court-ordered child support obligations. *Id.* at 776–77. Iowa Code section 600B.41(7)(c) (1993) provided that "[i]f the court finds that the establishment of paternity is overcome, in accordance with all of the conditions prescribed, the established father is relieved of all *future* support obligations owed on behalf of the child." *Wilcox*, 532 N.W.2d at 777.

We held that "where the rights of the parties have been established, support payments which have accrued are vested and the courts, without statutory authority, cannot take them away." *Id.* Thus, the putative father was responsible for making the accrued support payments on behalf of the minor child. *Id.* at 778.

In *Wilcox*, we rested our holding, in part, on the fact that Iowa Code § 600B.41A(4)(*b*) (1995), which had not yet taken effect, provided:

> Any periodic support payment, due prior to the date the order determining that the established father is not the biological father is filed, is unaffected by this action and remains a judgment subject to enforcement.

Section 600B.41A(4)(*b*) has since been amended and provides that "[i]f the court finds that the establishment of paternity is overcome . . . the court shall enter an order which provides . . . [t]hat any unpaid support due prior to the date the order determining that the established

father is not the biological father is filed, is satisfied." *See* 1997 Iowa Acts ch. 175, § 215 (now codified at Iowa Code § 600B.41A(4)(*b*) (2011)). Thus, the specific holding of *Wilcox* with respect to accrued but unpaid child support has been legislatively overruled.

In any event, *Wilcox* does not control the case before us. Our conclusion in *Wilcox* rested on a long line of cases holding that "courts do not have the authority under the common law to reduce court-determined support payments retroactively." *Wilcox*, 532 N.W.2d at 776–77 (citing cases). We stated that this rule "reflects the policy of protecting the stability and integrity of court judgments." *Id.* at 777 (citing *Shepherd*, 429 N.W.2d at 147). The present matter does not involve a court-imposed child support decree. Thus, the attendant concern of respect for the integrity of valid judgments present in *Wilcox* is inapplicable here. *Id.*

**A. Traditional Law of Fraud.** As noted, Dier is not seeking relief under Iowa Code section 600B.41A(4)(*b*), which permits a putative father who has overcome the establishment of paternity to avoid all unpaid and future support obligations. Rather, Dier has brought a common law action for fraud seeking as damages monies voluntarily paid based on an allegedly fraudulent representation. From our vantage point, Dier's cause of action appears to fit comfortably within the traditional boundaries of fraud law.

In order to prevail on a common law fraud claim the plaintiff must prove the following:

> (1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . ., (7) the representation was a

proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)).[3] Each element must be established " 'by a preponderance of clear, satisfactory, and convincing proof.' " *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004) (quoting *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996)). As the following discussion shows, we believe the petition is sufficient to set forth a traditional fraud claim.

1 & 2. *False representation.* Dier alleges that Peters told him he was the child's biological father. The two subsequent paternity tests demonstrate that this representation was false.

3. *Materiality.* In order to recover in an action for fraud the alleged false misrepresentation must be material. *Rosenberg v. Miss. Valley Constr. Co.*, 252 Iowa 483, 486, 106 N.W.2d 78, 80 (1961). We have said that a fact is material if it substantially affects the interest of the party alleged to have been defrauded. *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 292 (Iowa 1975). We have also said that a fraudulent misrepresentation is material if it is likely to induce a reasonable person to act. *See, e.g., id.*; *Kanzmeier v. McCoppin*, 398 N.W.2d 826, 830 (Iowa 1987). According to the Restatement (Second) of Torts, a matter is material if:

---

[3]At times we have spoken in terms of *seven* required elements. *Van Sickle Const. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). In those instances, we have treated the seventh and eighth elements above as a single element—"resulting injury and damage." *Id.*; *see also Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004). On other occasions, we have referred to six elements of fraud. *See In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999).

(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

Restatement (Second) of Torts § 538, at 80 (1977); *see also Sedco Int'l, S. A. v. Cory*, 522 F. Supp. 254, 323 (S.D. Iowa 1981) (applying Iowa law in diversity case).

Dier has alleged a material misrepresentation. Being the father of a child is an important matter, bringing with it legal, financial, and moral responsibilities. Dier alleges that his decision to voluntarily incur the expenses associated with supporting the child and her mother were "based upon the representations made by the Defendant" and that Peters "used this assertion to secure monies from [him]." These allegations support his claim that the false representation induced him to act and that the defendant knew that he was likely to regard the assertion "as important in determining his choice of action." *See* Restatement (Second) of Torts § 538, at 80. We cannot say that a reasonable person would not have attached significant importance to the specific fraudulent misrepresentation in this case.

4. *Knowledge of falsity.* The knowledge of falsity element of a fraud claim is also commonly known as the scienter element. *See Rosen v. Bd. of Med. Exam'rs*, 539 N.W.2d 345, 350 (Iowa 1995) (analyzing fraud in the context of a medical licensure proceeding but noting that there is "little, if anything, to distinguish the elements of fraud as defined by the board's administrative rule from the rule as applied at common law"). "The element of scienter requires a showing that alleged false representations were made with knowledge they were false [but t]his

requirement is met when the evidence shows such representations were made in reckless disregard of their truth or falsity." *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976).

We have held that a plaintiff can prevail on the scienter element by demonstrating:

> the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth, falsely stated or implied that the representations were based on personal knowledge or investigation, or had a special relationship with the plaintiff and therefore had a duty to disclose.

*McGough v. Gabus,* 526 N.W.2d 328, 331 (Iowa 1995).

Here Dier specifically alleges that "the Defendant knew that the Plaintiff was not the biological father of the child." Thus, he has alleged scienter.

5. *Intent to deceive.* We have held that the intent to deceive element, like the scienter element, may be proved in one of two ways: "by proof that the speaker (1) has actual knowledge of the falsity of the representation or (2) speaks in reckless disregard of whether those representations are true or false." *Rosen,* 539 N.W.2d at 350.

Dier alleges that Peters not only knew he was not the biological father, but "used this assertion to secure monies from [him]." These allegations are sufficient to survive a motion to dismiss on the intent to deceive element. Dier has also bolstered his petition with the further allegation that Peters only announced later that Dier was not the child's biological father out of fear Dier would get custody of the child following a child custody evaluator's report.

6. *Justifiable reliance.* To bring a fraud claim, the plaintiff must have justifiably relied on the false representation. *Spreitzer,* 779 N.W.2d at 737. "[T]he justified standard followed in Iowa means the reliance

does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances." *Id.* (citing *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980) (indicating that the justifiable reliance element is viewed in light of plaintiff's own information and intelligence)). Still, the individual to whom the fraudulent misrepresentation is made is " 'required to use his senses, and cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' " *Lockard,* 287 N.W.2d at 878 (quoting Restatement (Second) of Torts § 541 cmt. *a*, at 89).

Dier alleges that Peters told him he was the child's biological father, and that "based upon th[is] representation," he "provided for the child, provided for the Defendant and engaged in litigation . . . as to the custody of the child." At the pleading stage, these allegations are sufficient. It is true that a paternity test could have established at the outset whether Dier was the child's father, notwithstanding any representation by Peters. But we are unwilling to hold as a matter of law that a putative father can never rely on a mother's representation that he is the father and must immediately insist upon paternity testing. Dier's allegations are adequate on the justifiable reliance element.

7. *Proximate cause.* Proximate cause "address[es] the question whether the losses that in fact resulted from the reliance were connected to the misrepresentation in a way to which the law attaches legal significance." *Spreitzer*, 779 N.W.2d at 740.

Dier alleges that he provided financial support and incurred the expense of custody litigation "based upon the representations made by the Defendant." These allegations are sufficient to plead proximate

cause. Not only does Dier allege he spent money based on the misrepresentation, but common sense tells us that the misrepresentation increased the likelihood he would spend this money.

8. *Damages.* "A showing of resulting injury or damages is an element in a fraudulent misrepresentation case." *Sanford v. Meadow Gold Dairies, Inc.*, 534 N.W.2d 410, 413 (Iowa 1995). Fraud that does not result in an ascertainable injury is not actionable. *Spreitzer*, 779 N.W.2d at 739.

As damages, Dier seeks reimbursement of financial support provided to Peters and the minor child and expenses incurred during the custody litigation. These items are out-of-pocket expenses that are generally considered recoverable damages in a fraud case, the theory here being that Dier would not have incurred these expenses but for the misrepresentation. *See Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*, 585 N.W.2d 735, 739 (Iowa 1998).

However, we have consistently held that "[a] successful party ordinarily cannot recover attorney fees unless they are authorized by statute or agreement." *Audus v. Sabre Commc'n Corp.*, 554 N.W.2d 868, 874 (Iowa 1996). Yet we have long recognized an exception to this rule when a person, due to the tort of another, is required to protect his interests by bringing or defending an action against a *third person. Turner v. Zip Motors*, 245 Iowa 1091, 1097, 65 N.W.2d 427, 431 (Iowa 1954); *see also Kimmel v. Iowa Realty Co.*, 339 N.W.2d 374, 380 (Iowa 1983). In such cases, we have allowed the plaintiff to recover his or her attorney fees in the third-party action from the tortfeasor. *Turner*, 245 Iowa at 1097, 65 N.W.2d at 431. This view is in accord with the Restatement (Second) of Torts section 914(2) which states, in part:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

Restatement (Second) of Torts § 914(2), at 491 (1979).

Dier has alleged that he was forced to engage in custody litigation as a result of Peters' fraudulent misrepresentation. But the exception to the general rule noted above does not apply because the custody action was against Peters, not a third party. *See Moser v. Thorp Sales Corp.*, 334 N.W.2d 715, 719 (Iowa 1983) (declining to apply the exception absent a showing that defendant, "by his tort or breach of contract[,] forced [the plaintiff] to become involved in third-party litigation"); *see also Tolve v. Ogden Chrysler Plymouth, Inc.*, 755 N.E.2d 536, 541 (Ill. App. Ct. 2001) (holding attorney's fees expended by an automobile buyer to defend prior suit did not establish damages element of her fraud claim where prior litigation involved the same parties and the same alleged wrongful conduct); *In re Estate of Snover*, 546 N.W.2d 341, 350 (Neb. Ct. App. 1996) ("We can find no case . . . where the Supreme Court has applied this exception to a situation where the prior action involved the *same* parties rather than a *third party*."). Therefore, to the extent Dier is seeking the recovery of his costs and attorneys' fees in the earlier litigation with Peters, this request seems to fall outside the scope of historically recoverable fraud damages.[4]

---

[4]We are not holding that Dier would have been precluded from recovering his costs and attorney fees by making a claim in *the custody litigation itself*. Courts have allowed recovery of common law attorneys' fees in rare cases where " 'the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *See Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163, 181 (Iowa 2006) (quoting *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993)); *see also Wolf v. Wolf,* 690 N.W.2d 887, 896 (Iowa 2005).

With the foregoing exception, Dier has not alleged, or asked this court to adopt, a new cause of action or theory of recovery. Rather, he has stated a claim for traditional common law fraud. We have said that the common law is presumed to be in force in this state unless it has been revised or repealed by statute or constitution. *See Iowa Civil Liberties Union v. Critelli*, 244 N.W.2d 564, 568 (Iowa 1976). Although the facts in this case are somewhat novel, Dier has alleged a well-recognized civil wrong without contorting any of the elements to conform to his facts. We have said that "tribunals [should have] the liberty to deal with [fraud] in whatever form it may present itself. *Rosen*, 539 N.W.2d at 349.

In fact, we have previously allowed causes of action for common law fraud to proceed in other cases with atypical fact patterns. For example, in *Wright v. Brooke Group Ltd.*, we had to decide the following certified question: "Under Iowa law, can a manufacturer's alleged failure to warn or to disclose material information give rise to a fraud claim when the relationship between a Plaintiff and a Defendant is solely that of a customer/buyer and manufacturer?" 652 N.W.2d 159, 163 (Iowa 2002).

In answering this question we acknowledged that the case was atypical: "Iowa cases applying a fraud theory have typically involved a business transaction between the parties, a fact not present in the certified question." *Id.* at 175. Nonetheless, we reasoned that

> what is really important is that the statements were made for the purpose of influencing the action of another. The fact that this element is usually found in transactions where the parties deal directly with one another does not mean that the same goal of influencing another's action cannot be present in business transactions that do not involve direct contact between the plaintiff and the defendant.

*Id.* at 176 (citing cases). Thus, we concluded that a manufacturer's failure to warn or to disclose material information may give rise to a fraud claim when the manufacturer "(1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading." *Id.* at 177 (citing Restatement (Second) of Torts § 551(2)(b), (c), at 119 (1977)).

In *Beeck v. Kapalis*, we held the plaintiffs could pursue a fraud action against Aquaslide and its president for making a reckless, but innocent, misrepresentation that the water slide injuring one of the plaintiffs had been manufactured by Aquaslide—thereby causing the plaintiffs to fail to name the actual manufacturer as a defendant before the statute of limitations ran. 302 N.W.2d 90, 94–95 (Iowa 1981). There we noted that "[t]he fact that defendants were not motivated by ill will toward Beecks and thought they were helping Beecks by narrowing the scope of the litigation does not necessarily preclude a finding of fraud." *Id.* at 95.

**B. Public Policy.** Despite the apparent fit between this case and common law fraud, defendant contends that judicial recognition of a cause of action for paternity fraud would be contrary to Iowa public policy. She relies on the Nebraska Supreme Court's decision in *Day*, a case where a father sought recovery of court-ordered child support he had been required to pay from 1991 to 1999 for a child who had been born in 1987 while he was married to the child's mother. 653 N.W.2d at 477. There the Nebraska Supreme Court reasoned:

> Robert's fraud and assumpsit claims are for Robin's misrepresentation that led Robert to make investments of time, emotion, and money in Adam that he would not have made had he known that Adam was not his biological son.

> In effect, Robert is saying, "He is not my son; I want my money back." Robert's fraud and assumpsit causes of action focus on the burdens of the parent-child relationship, while ignoring the benefits of the relationship. We do not believe that having a close and loving relationship "imposed" on one because of a misrepresentation of biological fatherhood is the type of "harm" that the law should attempt to remedy.
>
> Moreover, a tort or assumpsit claim that seeks to recover for the creation of a parent-child relationship has the effect of saying "I wish you had never been born" to a child who, before the revelation of biological fatherhood, was under the impression that he or she had a father who loved him or her. We decline to allow a party to use a tort or assumpsit claim as a means for sending or reinforcing this message.

*Id.* at 479 (internal citations omitted).

While these concerns are legitimate, we are not ultimately persuaded by them. For one thing, O.D. is not fifteen years old, like the child in *Day*, but three. We are not persuaded that allowing the present cause of action to go forward would impose additional stress on the child, who is not a party to the case, and likely need not participate in it or even be aware of it. It is true that Dier's success in the litigation could diminish the resources that Peters has available in the future to support O.D., but this would be true of any lawsuit against Peters. We have never afforded parents a general defense from tort liability on the ground they need all their money to raise their children.

Also, we need to consider the public policy implications of an opposite ruling. We recognize fraud as a cause of action partly to deter lying. One good reason to allow fraud claims to go forward in the area of paternity fraud is to avoid the situation that has allegedly arisen here.

We have emphasized that "public policy" is not predicated on this court's "generalized concepts of fairness and justice." *Claude v. Guaranty Nat'l Ins. Co.*, 679 N.W.2d 659, 663 (Iowa 2004) (citation and internal quotation marks omitted) (holding that a physical contact

requirement for underinsured motorist coverage was not against any recognized public policy). Rather, " '[w]e must look to the Constitution, statutes, and judicial decisions of [this] state, to determine [our] public policy and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals contravenes no principle of public policy.' " *Id.* (quoting *In re Marriage of Witten*, 672 N.W.2d 768, 780 (Iowa 2003)).

"[D]espite the difficulty of characterizing the exact elements of the public interest, we have considered and weighed public policy concerns when deciding important legal issues." *Galloway v. State*, 790 N.W.2d 252, 255 (Iowa 2010) ("acknowledg[ing] the challenging nature of identifying which societal values are properly included within the purview of 'public policy' "). This is not the first time we have "confronted public policy considerations in the context of litigation between family members." *Id.*

In *Shook v. Crabb*, we abolished interspousal immunity and recognized the "fundamental policy consideration of providing judicial redress for an otherwise cognizable wrong." 281 N.W.2d 616, 618 (Iowa 1979). We reasoned that "to deny a forum for the redress of a wrong would do little to advance the compatibility of a married couple." *Id.* at 619. Two years later we abrogated parent–child immunity. *Turner v. Turner*, 304 N.W.2d 786, 787–89 (Iowa 1981). We found unpersuasive in *Turner* the same arguments about "the threat to domestic tranquility" that had been asserted unsuccessfully in *Shook*. *Id.* at 787.

Our evaluation of public concern here is consistent with *Shook* and *Turner*. In fact, there is less reason to be concerned about family harmony in a case where, because of paternity fraud, one of the parties who thought he was part of the family is now being removed from it.

This state has a recognized public policy interest in providing a remedy for fraud.[5]  As an Illinois court reasoned in allowing a paternity fraud claim to go forward, "public policy does not serve to protect people engaging in behavior such as that with which plaintiff's complaint charges" nor does it "allow defendant[s] to use [their children] to avoid responsibility for the consequences of [their] alleged deception."  *Koelle v. Zwiren*, 672 N.E.2d 868, 875 (Ill. App. Ct. 1996).  For the foregoing reasons, we conclude that allowing Dier's claim to go forward would not be contrary to public policy.[6]

---

[5]*See, e.g.*, *Midwest Home Distrib., Inc.*, 585 N.W.2d at 742 (noting that "allow[ing] a defrauding defendant to retain the bounty of its fraud [is] contrary to . . . public policy"); *Webb v. Am. Family Mut. Ins., Co.*, 493 N.W.2d 808, 812 (Iowa 1992) (denying insurance recovery based on insured's fraud and noting that "[d]rafting the policy to expressly deny recovery not only serves the interest of the insurance companies but also advances the public good by discouraging fraud" (quoting *Vance v. Pekin Ins. Co.*, 457 N.W.2d 589, 593 (Iowa 1990))); *Howard v. Nat'l French Draft Horse Ass'n*, 169 Iowa 719, 726, 151 N.W. 1056, 1059 (1915) ("It has been the just pride of our jurisprudence that neither law nor equity will give countenance to fraud and that, no matter how novel or ingenious its scheme, the courts will interfere to prevent its consummation and to redress the injury resulting therefrom to innocent persons.").

[6]We distinguish this case from the so-called "wrongful birth" cases where a biological parent tries to recover the costs of rearing a healthy child on the theory that the defendant's negligence allowed the child to be born.  *See Nanke v. Napier*, 346 N.W.2d 520 (Iowa 1984).  In denying such a theory of recovery in *Nanke*, we relied in part on

> the public policy of Iowa which dictates that a parent cannot be said to have been damaged or injured by the birth and rearing of a normal, healthy child because the invaluable benefits of parenthood outweigh the mere monetary burdens as a matter of law.

*Id.* at 522–23.

In this case Dier is not alleging that he had a biological parent–child relationship negligently imposed on him.  Rather, he is alleging that he was fraudulently induced into believing he had a biological child, but in reality did not.  Consequently, Dier could not prevail in the custody litigation, and he will actually be denied the "invaluable benefits of parenthood" we discussed in *Nanke*.  *See id.* at 523.  The public policy considerations that foreclosed damages for wrongful life in *Nanke* are inapplicable in a case where the plaintiff is being denied a parent–child relationship.

**C. Section 600B.41A.** Finally, we consider whether allowing Dier's paternity fraud claim would be contrary to a law or policy expressed by the general assembly. As we have discussed above, Iowa Code section 600B.41A addresses the consequences of overcoming the presumption of paternity and provides:

> 4. If the court finds that the establishment of paternity is overcome, in accordance with all of the conditions prescribed, the court shall enter an order which provides all of the following:
>
> *a.* That the established father is relieved of any and all future support obligations owed on behalf of the child from the date that the order determining that the established father is not the biological father is filed.
>
> *b.* That any unpaid support due prior to the date the order determining that the established father is not the biological father is filed, is satisfied.

*Id.* § 600B.41A(4).

Thus, section 600B.41(4) relieves the putative father from future support obligations and from accrued but unpaid support obligations. By implication, particularly in light of *Wilcox*, support that has already been paid may not be recovered. 532 N.W.2d at 776–77. We think it is clear, though, and Peters does not dispute, that "support" in this context means court-ordered support. *See* Iowa Code § 600B.24 (providing that "[u]pon a finding of paternity against the defendant, the court shall enter a judgment against the defendant declaring paternity and ordering support of the child"); *see also id.* § 598.1(9) (defining "support" to mean "an amount which the court may require either of the parties to pay"). Still, Peters argues that it would be incongruous for us to permit recoveries of prior voluntary support payments when the legislature has disallowed recoveries of prior court-ordered support payments.

We do not agree. As noted above, *Wilcox* and the preceding cases involving court-ordered support were predicated on "the policy of protecting the stability and integrity of court judgments." *Wilcox*, 532 N.W.2d at 777. In a proceeding for support, the putative father has the right to seek paternity testing. *See* Iowa Code § 600B.41(1). If the putative father does not exercise that right and a support decree is entered, then it is fair to give that decree a measure of finality. For example, in *Wilcox*, the putative father allowed a default judgment to be entered against him for child support. 532 N.W.2d at 775–76. Then, over a year later, he filed an application to set aside the judgment of paternity. *Id.* at 776. As a general matter, when a decree is entered, it may be modified prospectively in appropriate circumstances, but unless the law recognizes it as void for some reason, it may not be invalidated ab initio. *See, e.g.*, *In re Marriage of Johnson*, 781 N.W.2d 553, 559 (Iowa 2010) (noting that "each installment payment of a spousal support award in the original decree becomes a binding final judgment when it comes due and cannot be decreased until a subsequent judgment is entered decreasing the original award") (citing *Shepherd*, 429 N.W.2d at 146; *Walters v. Walters*, 231 Iowa 1267, 1270, 3 N.W.2d 595, 596 (1942)).

Allowing a cause of action here does not contravene these principles. We are not concerned here with the finality of a prior decree or judgment. According to the petition here, Dier voluntarily made payments to Peters for the benefit of O.D. once Peters told him he was the father. We believe this sort of conduct should be encouraged, not discouraged. Of course, to protect the child's interests, and to insure that the payments meet what our guidelines require, proceedings may be instituted under chapter 600B.

**IV.  Conclusion.**

For the foregoing reasons, we hold that Dier's claim for paternity fraud should not have been dismissed.  It is supported by common law standards for fraud and is not contrary to public policy or the statutory policy of this state.  Of course, we emphasize the limits of our holding.  As noted above, while Dier may pursue recovery of monies provided to Peters or spent for the benefit of the minor child (assuming he was not under a court order to make these payments), he may not recover attorneys' fees and costs incurred in the prior custody litigation with Peters.

Also, alleging paternity fraud is not the same as proving it.  We have said that "[p]roving fraud is a difficult task."  *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999).  That is certainly true with paternity fraud where sufficient proof will have to be advanced as to both Peters' state of mind when she made the representation and Dier's justifiable reliance thereon.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Cady, C.J., who concurs specially.

#11–1581, *Dier v. Peters*

**CADY, Chief Justice (concurring specially).**

I concur in the opinion of the majority. I write separately to clarify my reason for joining the holding by the majority to allow the claim to go forward and to emphasize the inherent difficulties and challenges presented by opening the courthouse doors to paternity fraud.

While claims for fraud have been applied to many types of relationships of trust and confidence, such as attorney and client, employer and employee, and accountant and investor, the relationship involved in a claim of paternity fraud is distinguishable by the inherent presence of uncertainty caused by conversations or assurances of paternity. *See Wilson v. Vanden Berg*, 687 N.W.2d 575, 577 (Iowa 2004) (resolving fraudulent misrepresentation appeal between an attorney and his clients); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004) (resolving fraudulent misrepresentation appeal between employer and employee); *Eldred v. McGladrey, Hendrickson & Pullen*, 468 N.W.2d 218, 220 (Iowa 1991) (recognizing validity of claim for fraudulent misrepresentation between investors and accounting firm that performed an audit, but finding insufficient evidence of reliance). All personal interaction exists in a kaleidoscope of reasoning affected by an ever-changing landscape of complex motivations and emotions. But, relationships marked by sexual intimacy can be the most complex, sometimes so complex that the conduct they produce can defy common reasoning found in the outside world. Consequently, a mother, or an expectant mother, may choose to tell a man that he is the father of her child for many reasons that are unrelated to mere financial gain. A man may also choose to form a bond with a child regardless of whether the

child is biologically his own, and as in this case, a putative father may feel wrongly persuaded into forming a supportive bond with the child and may be entitled to recover for the misrepresentation. In the end, it becomes painfully obvious that parties pushed into the justice system over a paternity fraud claim could never leave it unscathed, and the standards of justice will certainly be stretched to their limits, even if justice is attainable. This consequence may cause many reasonable, caring people to simply leave the claim dormant for the betterment of others. For sure, these circumstances have caused some courts to carve an exception for fraud in the context of paternity by condemning the putative father's initiative to recover. Yet, our precedent has not been for courts to decide whether it is prudent social policy to limit a common law cause of action for fraud simply because the facts present a difficult or complicated issue within the realm of otherwise normal legal framework. *See Rosen v. Bd. of Med. Exam'rs*, 539 N.W.2d 345, 349 (Iowa 1995) (recognizing "[f]raud is a generic term whose precise contours are often left undefined for the very purpose of giving tribunals the liberty to deal with it in whatever form it may present itself"). Nor is it our role to apportion blame between parties for any tension or turmoil between the child and the parents, particularly when these matters arise out of both parties' uniquely complex motivations. Instead, our role is simply to determine whether the plaintiff has established a cause of action according to our rules of notice pleading. This approach, of course, does not mean we should ignore the reality that certain types of fraud cases carry collateral consequences that are sometimes difficult to swallow.

While the misleading conduct of a mother, or any person, should be discouraged, the conduct of a man voluntarily forming a bond with and supporting a nonbiological child in a nontraditional family setting is,

on the other hand, arguably a noble cause to encourage in our society. *See* Melony B. Jacobs, *When Daddy Doesn't Want to be Daddy Anymore: An Argument Against Paternity Fraud Claims*, 16 Yale J.L. & Feminism 193, 195–98 (2004) (noting the disconnected logic that seems contrary to efforts to make decisions in accordance with the best interests of the child when our courts recognize two fundamentally different family law models, one that "embrace[s] functionality in the context of establishing paternal relationships" and the other that "place[s] emphasis on biology in disestablishing parental relationships").  As the Nebraska Supreme Court recognized, a claim seeking to recover for support given to a child may send the message, "I wish you had never been born" to a child who was otherwise under the impression she had a father who loved her. *Day v. Heller*, 653 N.W.2d 475, 479 (Neb. 2002).  However, our courtroom doors are open to complex cases involving children and their parents, such as divorce and custody disputes, termination of parental rights, disestablishment of paternity, and interspousal litigation.  The proceedings that ultimately unfold in a courtroom are not easy or pleasant for anyone involved, but the court is nevertheless necessary to provide a forum for addressing an alleged wrong that has already occurred within a family unit.

Thus, due to the multidimensional nature of relationships that produce children, and the many varying factors that motivate or incentivize parties involved in the child's life, the legislature is the proper authority to balance the competing policy interests at stake and ultimately articulate the parameters of any exception to common law fraud based on public policy.  Our refusal to create an exception to this case is not an expression of an opinion that the competing policy reasons are not valid.  Instead, as a court, we simply continue to adhere to our

broader policy, woven into the law long ago, of recognizing a remedy for fraud.

Finally, as pointed out by the majority, "[p]roving fraud is a difficult task." *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999). Thus, Dier, and any other future litigant, faces a challenging burden to establish the essential elements of fraud and, most importantly, a measure of damages consistent with the burden on plaintiffs in other types of fraud cases. Yet, paternity fraud likely presents even greater challenges, making it even more difficult to establish. The tort necessarily involves an understanding of not only what the mother knew at the time of the representation but also what she was capable of knowing in light of the biological complexities of the female reproductive system and highly individualized biological permutations between couples that can affect fertility. *See Beeck v. Aquaslide 'n' Dive Corp.*, 350 N.W.2d 149, 155 (Iowa 1984) (" 'A false statement innocently but mistakenly made will not establish intent to defraud . . . .' " (quoting *Grefe v. Ross*, 231 N.W.2d 863, 867 (Iowa 1975)); *see Garren v. First Realty, Ltd.*, 481 N.W.2d 335, 338 (Iowa 1992) (finding the defendant "could have been more careful in making further inquiry is insufficient to prove she acted in reckless disregard for the truth"). The scientific component of establishing knowledge and intent will likely narrow the types of plaintiffs able to succeed on the merits to those that have facts consistent with the spirit and purpose of the cause of action.

Additionally, the fact finder is responsible for ensuring that only facts directly relevant to the elements of fraud are considered in establishing the necessary proof in such particularly delicate and sensitive emotional fraud cases. Of course, as in other areas of the law, the discovery of this information will not come without a price. In this

case, much time may need to be spent uncovering details from Peters regarding her knowledge of the paternity of the child that may involve her disclosing details of her sexual history that are intimate and perhaps at times embarrassing to her.  But, let the buyer beware, too.  Investigating the element of justifiable reliance will likely dig deeply into the relationship, revealing potentially unattractive details about the conduct and personalities of both parties.

Although these consequences might seem inequitable at times, relevant evidence can often be embarrassing to parties and witnesses in other types of cases.  We do not foreclose a cause of action because some information relevant to the truth-seeking process may be uncomfortable to disclose.  *State v. Baker*, 679 N.W.2d 7, 11 (Iowa 2004).  Fact finders are entrusted with the important task of weighing the value that each fact contributes in proving the elements of fraud.  This is a process we trust time and time again and a process I am confident will continue to strike the appropriate balance between the competing interests involved in disclosing such sensitive information.  At the same time, the process may be one made better by its infrequent use.